DILLON, Judge.
*629 Respondent-Mother ("Mother") and Respondent-Father ("Father") (collectively referred to as "Parents") appeal from an order adjudicating L.Z.A. ("Lisa")[1] abused and neglected and continuing custody with the Mecklenburg County Department of Social Services, Youth and Family Services ("YFS"). After careful review, we affirm.
I. Background
The instant action stems from a report YFS received alleging that four-month-old Lisa had been admitted to the hospital on either *630 3 December 2014 or 4 December 2014 with bilateral bleeding in the brain, a shifting of the brain off of the midline, and a skull fracture. Lisa was in Parents' custody when she sustained these injuries. Due to the nature of her injuries, medical personnel performed *164 a non-accidental trauma ("NAT") series on Lisa, which revealed that Lisa had fractured her arm around the same time she sustained her other injuries.
Parents' recount of the events leading up to Lisa's admission to the hospital is as follows. During the week of Thanksgiving,[2] Mother noticed that Lisa was behaving differently-Lisa appeared sad, angry, and uncomfortable. This behavior continued after Thanksgiving. In addition, Lisa began drinking less milk. On 1 December 2014, Parents took Lisa to the hospital because she was sweating and had a fever. Lisa was discharged and prescribed an antibiotic.
When Lisa's condition failed to improve, Parents took her to a different hospital. Lisa was admitted with vomiting and a fever, and a computerized topography ("CT") scan revealed bilateral subdural hematomas and a linear left parietal skull fracture. Lisa's attending examiner opined that the "constellation of findings raises the possibility of non-accidental trauma." Due to the possibility of non-accidental trauma, Lisa was given a full skeletal survey. In addition to the left skull fracture, the skeletal survey revealed a linear right parietal fracture. The skeletal survey also revealed a "healing fracture of the distal left humerus."
On 8 December 2014, Dr. Marc Mancuso, a pediatric radiologist, reviewed the CT scan results and skeletal survey. His observations regarding the fractures to the back of Lisa's head are as follows: "[t]here was a linear fracture of the left parietal calvarium ... that also involved a suture-that's where bones of the head are separate-and another fracture on the other side which may have been connected through the sutures to the fracture on the right side." He was unsure whether Lisa had two distinct fractures or one fracture that "communicate[d] through a suture." Dr. Mancuso opined that "either a blow to the skull or the skull being struck against a hard object" was the cause of the skull fracture. Dr. Mancuso reasoned that the fracture(s) could have been caused by a fall only if Lisa fell over three feet onto a hard surface.
Dr. Mancuso also explained that Lisa had a fracture to her left humerus, the large bone of her upper arm. He noticed some new bone formation, which indicated that Lisa's arm was healing. The arm fracture was above the elbow; Dr. Mancuso noted that fractures of these sorts in *631 infants are most commonly caused by twisting or bending the joint. Dr. Mancuso concluded that "infants of [Lisa's] age are not able to cause fractures of this sort under their own power."
After reviewing the skeletal survey, Dr. Mancuso determined that Lisa's arm fracture was "highly specific for nonaccidental trauma," and that the additional skull fracture "increases specificity." He opined that the injuries occurred anywhere from one to three weeks prior to the skeletal survey.
On 15 December 2014, Lisa was discharged from the hospital. On 17 March 2015, she had a CT scan, which appeared to indicate recent brain bleeding. It was later determined that this bleeding resulted from her original injuries. Another CT scan conducted on 28 April 2015 indicated that Lisa's brain injuries were improving, with no recent bleeding.
Parents affirmed that they were Lisa's sole caregivers at all relevant times. After Lisa's birth in August 2014, Mother returned to work shortly thereafter, and a neighbor named "Doris" cared for Lisa. Doris, however, stopped caring for Lisa during the last week of October. Father was out of town working when Lisa was born. He returned to North Carolina for two weeks shortly after her birth, and then left again. Father returned home on 14 November 2014 and was Lisa's sole caregiver after his return. Doris did not provide any babysitting for Lisa in November 2014.
Father indicated that a woman named "Ana" babysat Lisa on one occasion after Thanksgiving while he was attempting to purchase a house. Father's testimony appeared to waver on the exact date Ana babysat Lisa. Nevertheless, Father testified that Ana did not babysit Lisa at any time between 14 November 2014 and Thanksgiving.
*165 During the Thanksgiving holiday, Parents visited other family members at a relative's house. Mother held Lisa for the majority of the visit due to Lisa's discomfort. While Father's ten-year-old daughter was present during the visit, she never had any unsupervised time with Lisa.
On 8 December 2014, YFS interviewed Parents separately; however, neither Mother nor Father had any explanation for Lisa's injuries. They denied that Lisa had fallen, been dropped or thrown, endured trauma, or been mistreated in any way.
In December 2014, YFS filed a petition alleging that Lisa was abused and neglected. The petition alleged, among other things, that the medical findings were consistent with non-accidental trauma, that the cause of Lisa's injuries was unknown, and that Parents were Lisa's sole caregivers *632 during the relevant time period. YFS was granted non-secure custody of Lisa, after which Lisa was placed with Father's ex-girlfriend.
On 25 November 2015, the trial court entered an order adjudicating Lisa abused and neglected. The trial court also concluded that it was in Lisa's best interest to remain in YFS custody. Parents appeal.
II. Standard of Review
Review of a trial court's adjudication of dependency, abuse, and neglect requires a determination as to (1) whether clear and convincing evidence supports the findings of fact, and (2) whether the findings of fact support the legal conclusions. In re Pittman , 149 N.C.App. 756, 763-64, 561 S.E.2d 560, 566 (2002) (citation omitted). "In a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." In re Helms , 127 N.C.App. 505, 511, 491 S.E.2d 672, 676 (1997). If competent evidence supports the findings, they are "binding on appeal." In re McCabe , 157 N.C.App. 673, 679, 580 S.E.2d 69, 73 (2003).
III. Analysis
A. Finding of Fact 3 is Largely Supported by Competent Evidence
We first address Parents' challenge of finding of fact 3, which provides as follows:
a. On December 8, 2014, [YFS] received a referral alleging that this child had been admitted to CMC-Levine Children's Hospital in the late evening of December 3 or early morning of December 4. The juvenile was found to have bilateral bleeding in the brain, a shifting of the brain off the midline (line from the crown of one's head down to the tip of one's nose) and a skull fracture. The referral further stated that an NAT (non-accidental trauma) series was going to be performed.
b. On December 8, 2014, medical personnel at Levine informed [YFS] that on or about December 1, 2014, the child had been taken to CMC-Pineville and was treated and released, that the child was currently responsive to stimuli, that the parents had no explanation for the injuries that led to this referral, and that there was a ten-year-old sibling that visited the *633 parents and this child but that the sibling did not have unsupervised time with this child.
c. On that same day, the parents were interviewed separately.... Their sentiments were similar to those expressed to [YFS] by the medical personnel.
d. Prior to the above incident, the parents brought the child to the hospital due to a fever and vomiting, and the hospital released the child with medication. The parents later brought the child back when she was not improving.
e. The juvenile was also exposed to out-of-state relatives with small children during the time that she was injured, but the juvenile was supervised at all times.
f. A CT scan performed on December 8, 2014 indicated that the child had subdural hematomas (bleeding on the brain ) on the left side and on the right side of her brain that were at least a *166 week old, that the size of the hematomas caused a shift of her brain off of her midline by approximately 5 millimeters, and that there was evidence of a linear left parietal skull fracture (approximately the back part of the skull behind left ear).
g. The NAT series indicated the following: the child had a right parietal skull fracture and a left humeral (upper arm) fracture. It was undetermined whether the right parietal skull fracture was part of the same fracture as the above-noted left parietal skull fracture or whether it was a separate fracture.
h. The findings noted by the medical personnel were consistent with non-accidental trauma.
i. Dr. Marc Mancuso testified, and this Court finds, that the fracture to the child's arm could not be caused by the child. The child's arm fracture was in a healing stage at the time of her hospitalization, indicating it had occurred prior to the skull fracture.
j. At this time, it is not known how the child sustained the aforesaid injuries. Per the parents, the child did have [Doris] as a babysitter. However, the Court finds *634 that the babysitting timeframe did not coincide with the injuries timeframe as determined by medical personnel nor did any injuries manifest themselves during that babysitting time.
k. [CMPD] has been investigating the matter, including subjecting the parents to lie detector tests, but neither parent has been charged with any criminal offenses.
l. The parents identified an alternative placement for the juvenile prior to the petition being filed.
We now review Parents' specific arguments regarding the sub-sections of finding of fact 3 in turn.
1. Parents' Argument that Certain Findings Are Invalid Because They Are Recitations of Petition Allegations Fails
Mother argues that many of these findings do not support the abuse and neglect adjudications as they are verbatim, or near verbatim, recitations of the allegations in the petition. "When a trial court is required to make findings of fact, it must find the facts specially." In re Harton , 156 N.C.App. 655, 660, 577 S.E.2d 334, 337 (2003) (internal quotation marks omitted). "Thus, the trial court must, through 'processes of logical reasoning,' based on the evidentiary facts before it, 'find the ultimate facts essential to support the conclusions of law.' " In re O.W. , 164 N.C.App. 699, 702, 596 S.E.2d 851, 853 (2004) (quoting Harton , 156 N.C.App. at 660, 577 S.E.2d at 337 ). Consequently, "the trial court's findings must consist of more than a recitation of the allegations" contained in the juvenile petition. O.W. , 164 N.C.App. at 702, 596 S.E.2d at 853.
However, "it is not per se reversible error for a trial court's fact findings to mirror the wording of a petition or other pleading prepared by a party." In re J.W. , --- N.C.App. ----, ----, 772 S.E.2d 249, 253 (2015). As we noted in In re J.W. :
[T]his Court will examine whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case. If we are confident the trial court did so, it is irrelevant whether those findings are taken verbatim from an earlier pleading.
Id.
*635 We acknowledge that several of the trial court's findings are verbatim recitations of the petition allegations. However, after reviewing the record, we are satisfied that "the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case." Id.
First, the order contains additional, substantive findings of fact that do not track the language of the petition allegations. Second, the trial court made its findings following several days of witness testimony and admitting medical records. Lastly, the trial court's interactions with the parties during the hearing demonstrates that the court engaged in *167 an independent, decision-making process in rendering its findings. At the close of the adjudicatory phase of the hearing, the trial court announced that it was "taking the matter under advisement to issue both its ruling with regard to the adjudication and specific findings." In between the adjudication and disposition hearings, the trial court and the parties apparently discussed a proposed order, and the court even modified a proposed finding of fact at Father's request. At the outset of the disposition hearing, the trial court discussed this modification with the parties, asked if they wished to be heard, and finalized the order. We are satisfied that the trial court's order is not invalidated due to some of the findings mirroring language in the petition.
2. Finding of Fact 3(e) is Supported by Competent Evidence
In finding of fact 3(e), the trial court found that "[t]he juvenile was also exposed to out-of-state relatives with small children during the time that she was injured, but the juvenile was supervised at all times." Mother admits that she and Father visited with out-of-state relatives on Thanksgiving, but avers that Lisa began acting differently prior to that date. Thus, Mother appears to take issue with any inference that Lisa's injuries occurred on Thanksgiving Day. Mother's contention is ultimately irrelevant. Dr. Mancuso testified that the injuries occurred anywhere from one to three weeks prior to the 8 December 2014 skeletal survey. Therefore, Thanksgiving Day was included as a possible date of injury. Furthermore, both a police officer and YFS social worker testified that Lisa was never unsupervised during the family's visit with out-of-state relatives on Thanksgiving Day. Therefore, even if Parents are to be believed, this finding is still supported by the evidence on record.
3. Finding of Fact 3(h) is Supported by Competent Evidence
In finding of fact 3(h), the trial court found that "[t]he findings noted by the medical personnel were consistent with non-accidental trauma."
*636 Father argues that this finding of fact is not supported by evidence as neither Parents nor the medical professionals could pinpoint the cause or date of Lisa's injuries. Father offers a number of speculative "what-ifs" as to the cause of Lisa's injuries and essentially asks this Court to re-weigh the evidence. The trial court's finding, however, is directly supported by Dr. Mancuso's testimony, and it is not our duty to re-weigh the evidence. See In re Hughes , 74 N.C.App. 751, 759, 330 S.E.2d 213, 218 (1985) ("The trial judge determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, he alone determines which inferences to draw and which to reject."). We disregard this challenge.
4. Finding of Fact 3(i) is Not Supported by Competent Evidence, However This Error is Non-Prejudicial
Parents challenge finding of fact 3(i), which provides that "[t]he child's arm fracture was in a healing stage at the time of her hospitalization, indicating it had occurred prior to the skull fracture." Parents argue that this finding is not supported by the evidence as Dr. Mancuso could not narrow down a specific time frame for the fractures and testified that it was "possible they all occurred at roughly the same time." It is true that Dr. Mancuso's testimony does not appear to support this finding. However, the record establishes that Lisa sustained multiple non-accidental injuries; therefore, pinpointing the precise time these injuries occurred is not necessary to sustain the trial court's adjudications. Accordingly, we find no prejudicial error in this finding.
5. Finding of Fact 3(j) is Supported by Competent Evidence
Finding of fact 3(j) provides that while Doris was Lisa's babysitter, "the babysitting timeframe did not coincide with the injuries timeframe as determined by medical personnel nor did any injuries manifest themselves during that babysitting time." Parents aver that this finding of fact is not supported by the evidence as Dr. Mancuso could not pinpoint the date of the injuries and could only give a range of several weeks. Again, we are not persuaded by this argument, *168 and conclude that this finding is supported by the evidence. Father testified that Doris last babysat for Lisa in October 2014. Dr. Mancuso opined that the injuries occurred anywhere from one to three weeks prior to the skeletal survey, which would have included the last two weeks in November 2014. There is clear and convincing evidence supporting this finding.
In conclusion, we hold that the trial court's findings, with the exception of finding of fact 3(i), are supported by clear and convincing *637 competent evidence. To the extent that finding of fact 3(i) is not supported by clear and convincing competent evidence, we find no prejudicial error.
B. The Abuse and Neglect Adjudications Were Warranted
We now turn to Parents' arguments regarding the trial court's abuse and neglect adjudications.
1. The Abuse Adjudication is Warranted
Parents contend that the trial court erred in concluding that Lisa was abused. An abused juvenile is defined, in pertinent part, as one whose parent, guardian, custodian, or caretaker "[i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means." N.C. Gen. Stat. § 7B-101(1) (2015). Parents contend that the findings of fact and evidence do not support an abuse adjudication as: (1) the medical experts had no definitive time frame or explanation for Lisa's injuries, and (2) there is no indication that there was or has been a pattern of abuse or any risk factors for abuse, such as domestic violence, substance abuse, or mental illness. Parents also argue that Lisa's injuries might have been caused by an accident. We hold that the trial court did not err in adjudicating Lisa abused.
This Court has previously upheld abuse adjudications where a child sustains unexplained, non-accidental injuries. See, e.g. , In re C.M. , 198 N.C.App. 53, 60-62, 678 S.E.2d 794, 798-800 (2009) (affirming abuse adjudication where the findings of fact established that the juvenile sustained a head injury that doctors testified was likely non-accidental, despite the fact that there was uncertainty as to when or how the injury occurred). See also State v. Wilson , 181 N.C.App. 540, 543, 640 S.E.2d 403, 406 (2007) ("[W]hen an adult has exclusive custody of a child for a period of time during which the child suffers injuries that are neither self-inflicted nor accidental, there is sufficient evidence to create an inference that the adult intentionally inflicted those injuries." (alteration in original) (internal quotation marks omitted)). The caselaw does not require a pattern of abuse or the presence of risk factors.
The findings of fact and evidence establish that Lisa sustained bilateral skull fractures, subdural hematomas, and an arm fracture. Medical personnel, including an expert witness at the hearing, determined that Lisa's injuries were likely the result of "non-accidental trauma." Parents offered no explanation for Lisa's injuries and were her sole caretakers at the time she sustained the injuries. Based on the time frame established by Dr. Mancuso, the injuries could not have occurred when Doris *638 was Lisa's caregiver. While Father testified that Lisa was cared for by Ana the day after Thanksgiving, Parents' own testimony indicates that Lisa's symptoms predated Thanksgiving. Thus, the findings of fact demonstrate that Lisa sustained severe, unexplained, non-accidental injuries while in Parents' custody. YFS was not required to rule out every remote possibility; nor was it required to prove abuse beyond a reasonable doubt. The trial court's findings of fact are sufficient to establish abuse.
2. Neglect Adjudication is Warranted
Likewise, Parents challenge the trial court's neglect adjudication. A neglected juvenile is defined as:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen. Stat. § 7B-101(15). This Court has consistently required that "there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such *169 impairment as a consequence of the failure to provide proper care, supervision, or discipline in order to adjudicate a juvenile neglected." In re McLean , 135 N.C.App. 387, 390, 521 S.E.2d 121, 123 (1999) (alteration in original) (internal quotation marks omitted).
Here, the evidence supporting the abuse adjudication also supports the neglect adjudication. See In re T.H.T. , 185 N.C.App. 337, 345-46, 648 S.E.2d 519, 525 (2007). Lisa's unexplained, non-accidental injuries while in Parents' custody establish that: (1) she either failed to receive proper care, supervision, or discipline from Parents or lived in an environment injurious to her welfare; and (2) she was physically impaired as a result. We therefore hold that the trial court's neglect adjudication is supported by clear and convincing competent evidence.
C. The Trial Court's Failure to Set Out a Minimum Visitation Plan in the Disposition Order was not an Abuse of Discretion
Parents argue that the trial court abused its discretion by failing to set out a minimum visitation plan. Visitation in juvenile matters is governed by N.C. Gen. Stat. § 7B-905.1, which provides as follows:
*639 If the juvenile is placed or continued in the custody or placement responsibility of a county department of social services, the court may order the director to arrange, facilitate, and supervise a visitation plan expressly approved or ordered by the court. The plan shall indicate the minimum frequency and length of visits and whether the visits shall be supervised. Unless the court orders otherwise, the director shall have discretion to determine who will supervise visits when supervision is required, to determine the location of visits, and to change the day and time of visits in response to scheduling conflicts, illness of the child or party, or extraordinary circumstances.
N.C. Gen. Stat. § 7B-905.1(b) (2015). Here, the trial court made the following dispositional finding of fact regarding visitation:
Visitation shall take place as follows: Supervised in accordance with the current plan. YFS has discretion to expand the supervised visitation, with GAL input. If therapeutic guidance is needed, YFS shall obtain that. YFS may explore the paternal aunt for provision of the supervision, as well as the current placement providers.
Parents argue that this finding of fact violates § 7B-905.1(b) because it fails to provide specific information regarding the frequency and length of visits. Parents, however, overlook the fact that this finding of fact provides that visits would occur "in accordance with the current plan." The current visitation plan was memorialized in the trial court's previous order, which provided the following:
Parents shall have visits on Tuesdays and Saturdays from 12 pm to 2 pm at a YFS facility. YFS/parents have discretion to modify the dates and times of visits as needed. YFS has discretion to expand visitation. The parents may also have an extended visit on Christmas Day. Parents visitation are to be supervised.
Viewing these two orders in conjunction, it is clear that the visitation plan authorizes supervised, twice-weekly two-hour visits with Parents. See J.W. , --- N.C.App. at ----, 772 S.E.2d at 255 (affirming a disposition order's visitation plan as the disposition order provided that all previous orders remained in full force and effect unless specifically modified, and a prior court order specified the frequency and duration of visits). These provisions satisfy the requirements of N.C. Gen. Stat. § 7B-905.1(b), and we therefore find no abuse of discretion.
*640 D. The Trial Court Did Not Err in its Implementation of a Concurrent Adoption Plan
Finally, Father argues that the trial court erred by implementing a concurrent plan of adoption in addition to the reunification plan. In the decretal portion of the trial court's disposition order, the trial court ruled that "[t]he plan of care shall be reunification.... The concurrent plan of care shall be adoption." At the hearing, the trial court elaborated on this issue:
The Court will still remind all the parties that the Court still has pause and concern as there has not been any identified perpetrator in this matter. The Court is providing that the recommendations be adopted with the Department maintaining legal and physical custody. Will note, both [Mother] and [Father], your cooperation at least with the Department and your follow-up *170 on the plan. So the Court was glad to see that.
The Court adopts the goal for reunification with a concurrent goal of the TPR/adoption.
Father's argument appears to be that the trial court's implementation of a concurrent adoption plan runs afoul of N.C. Gen. Stat. § 7B-901(c)(2015), which permits a trial court at disposition to "direct that reasonable efforts for reunification as defined in G.S. 7B-101 shall not be required if the court makes written findings of fact pertaining to [one of several aggravating factors]." Father submits that none of the aggravating factors were present in this case, and that the trial court's order therefore violated N.C. Gen. Stat. § 7B-901(c). However, the trial court did not cease reunification efforts and therefore was not required to make written findings of fact regarding the presence of one or more aggravating factors. On the contrary, the trial court adopted reunification as the primary plan and even suggested that reunification could begin after expanded visitation. Hence, the record establishes that the trial court did not attempt to cease reunification pursuant to N.C. Gen. Stat. § 7B-901(c).
Father also contends that the trial court erred in implementing a concurrent adoption plan as the trial court neglected to make the necessary findings under the section of our Juvenile Code governing permanency planning hearings. We find no error.
Specifically, Father argues that the trial court's order never made the following findings: (1) whether reunification efforts would be futile or inconsistent with the juvenile's need for a safe, permanent home within a *641 reasonable period of time; (2) when and if termination of parental rights should be considered; (3) whether it was possible for the juvenile to be returned home within the next six months; (4) whether guardianship should be established; and (5) whether adoption should be pursued. See N.C. Gen. Stat. § 7B-906.1(d)(3), (6), (e)(1)-(3). Father, however, overlooks the fact that the trial court was conducting a disposition hearing rather than a permanency planning hearing, and therefore was not required to issue the findings of fact required under Section 7B-906.1(d) and Section 7B-906.1(e). Accordingly, the trial court did not err in failing to issue these findings.
Lastly, Father argues that the trial court's order was erroneous as Parents' actions did not support a plan of adoption. We disagree.
"The district court has broad discretion to fashion a disposition ... based upon the best interests of the child." In re B.W. , 190 N.C.App. 328, 336, 665 S.E.2d 462, 467 (2008). We review a trial court's disposition order only for an abuse of discretion. Id. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." State v. Roache , 358 N.C. 243, 284, 595 S.E.2d 381, 408 (2004) (internal quotation marks omitted). Here, the trial court implemented a concurrent adoption plan due to the court's concern that a perpetrator still had not been identified. The trial court's order was based on a reasoned decision.
Furthermore, assuming, arguendo , that the trial court's implementation of a concurrent adoption plan was erroneous, Father cannot show prejudice. The primary plan of care was still reunification and Parents were still receiving services pursuant to a case plan. Father fails to establish that YFS is actively pursuing adoption. Lastly, we note that because the trial court ordered Lisa to remain in the custody of YFS, it is required to hold permanency planning hearings in accordance with Section 7B-906.1 and Section 7B-906.2 and make the requisite findings of fact at that time. We therefore discern no prejudicial error on the part of the trial court.
IV. Conclusion
For the foregoing reasons, we conclude that the trial court did not err in adjudicating Lisa abused and neglected. Accordingly, we affirm the trial court's disposition order.
AFFIRMED.
Judges McCULLOUGH and ENOCHS concur.

The pseudonym "Lisa" along with other pseudonyms are used throughout.

This Court takes judicial notice that Thanksgiving Day fell on 27 November 2014.