IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-43

Filed 15 October 2024

Forsyth County, No. 23 J 80

IN THE MATTER OF: N.N.

Appeal by respondent-parents from order entered 27 October 2023 by Judge David E. Sipprell in District Court, Forsyth County. Heard in the Court of Appeals 6 September 2024.

*Deputy County Attorney Theresa A. Boucher for petitioner-appellee Forsyth County Department of Social Services.*

*Michelle FormyDuval Lynch for the guardian ad litem.*

*Edward Eldred for respondent-appellant mother.*

*Marion K. Parsons for respondent-appellant father.*

STROUD, Judge.

Respondent-parents appeal from an order entered 27 October 2023 in which the district court adjudicated their infant child an abused and neglected juvenile and relieved petitioner Forsyth County Department of Social Services of efforts to reunify respondent-parents with the child. We affirm the district court's adjudication but vacate the portion of the disposition which did not require continued reunification efforts and remand the matter for further proceedings as discussed herein.

## I. Factual Background and Procedural History

Nan[1] was born in January 2023 at twenty-seven weeks gestation. Due to her extreme prematurity, Nan was immediately placed in the neonatal intensive care unit ("NICU") of the hospital, where she remained until mid-April 2023. On 28 April 2023, the Forsyth County Department of Social Services ("DSS") filed a petition, verified by DSS social worker Pamela Early, that alleged Nan was an abused and neglected juvenile. The petition alleged Nan was an abused juvenile in that respondent-parents ("Parents") had inflicted or allowed to be inflicted serious non-accidental physical injuries on Nan and created a substantial risk of future substantial non-accidental physical injuries to the child. As to neglect, the petition alleged that Parents did "not provide proper care, supervision, or discipline" for Nan.

The petition alleged DSS received a report on 18 March 2023 that hospital staff observed respondent-father ("Father") handling Nan roughly, specifically in picking her up "from behind her neck . . . without supporting her head." Hospital staff reported that each parent had been asked to leave the NICU for 24-hour periods— respondent-mother ("Mother") on 17 March and Father on the following day—due to the rough handling of Nan by Father and Parents "not following NICU protocols." Mother denied knowledge of Father handling Nan inappropriately. A safety plan was established to support Parents in safely handling Nan and a "virtual sitter" remote monitoring system was placed in the hospital room to observe Parents' interactions

---

[1] A pseudonym is used to protect the privacy of the juvenile and for ease of reading.

with Nan. When Early met with Father on 21 March 2023, he denied handling Nan roughly and stated that Parents had filed a complaint about a nurse "flicking" Nan. On 29 March 2023, DSS received another report, stating that Father had picked Nan up with one hand and had left her alone on a chair while he retrieved a blanket. Early met with Parents again and discussed how to safely pick up Nan. Parents again denied handling Nan in an unsafe way.

On 12 April 2023, Nan was discharged from the hospital into the sole care and custody of Parents. During a home visit on 17 April 2023, Early observed Nan sleeping and she appeared healthy and well. But only two days later, on 19 April 2023, DSS received another report stating that Parents brought Nan to a hospital emergency room ("ER"), reporting she had not been eating and was constipated. Upon arrival at the ER, Nan stopped breathing and had to be revived multiple times. Subsequent testing revealed that Nan had multiple injuries, including three skull fractures, bleeding on the brain and spine, other brain and spinal injuries, and retinal hemorrhages. In a child abuse consult on 26 April 2023, a physician determined that Nan's "injuries without any accidental explanation [were] highly concerning for abusive head trauma[,]" resulting in "a near-fatality event for [Nan]." Nan remained hospitalized for three months.

At a Child and Family Team meeting on 27 April 2023, Parents denied they had caused Nan's injuries and reported they had no knowledge of any incident or accident that would explain them. DSS filed the abuse and neglect petition the

following day and sought nonsecure custody of Nan. On 5 May 2023, the district court entered an order placing Nan in DSS's custody. When Nan was discharged on 17 July 2023, she was placed in a licensed foster home.

At the adjudication and initial disposition hearing held on 23 October 2023, counsel for Parents informed the district court that their clients would be "standing mute" as to the allegations in the juvenile petition. Early was called, sworn, and then testified to the truth and accuracy of the allegations in the juvenile petition, which was admitted into evidence without objection by Parents. DSS offered no additional adjudication evidence. Parents did not offer any evidence. The district court adjudicated Nan an abused and neglected juvenile and proceeded to disposition.

On disposition, the court heard testimony from two witnesses: Fialisa Pickard, the DSS foster care social worker assigned to Nan, and Sheila Connelly, the guardian *ad litem* ("GAL") for Nan. Pickard testified that her pre-hearing court report required two corrections: Mother was no longer employed in her previous job and Nan had a new physical therapy plan of care. Parents did not object to admission of the court report as amended. Pickard testified that Nan was "growing and thriving" in her foster care placement and receiving multiple therapies. Pickard also testified that Mother had denied knowing how Nan was injured because she was at work when the injuries occurred, and Father had offered no explanation for the injuries. Because Parents could not explain Nan's severe injuries, Pickard did not recommend that reunification efforts continue.

Connelly noted one update to her court report—also regarding Mother's employment status—and then testified about Nan's improving condition and Parents' appropriate conduct during visits with Nan. However, because Parents could not explain the severe injuries suffered by Nan, Connelly did not support continuing reunification efforts.

In the adjudication portion of the order entered 27 October 2023, the district court made sixteen findings of fact in agreement with the allegations in the juvenile petition summarized above. The court then adjudicated Nan an abused and neglected juvenile.

In the disposition part of the order, the court made forty-five findings of fact, including that Nan's "constellation of injuries without any accidental explanation is highly concerning for abusive head trauma," resulting in "a near-fatality for [Nan]" in which "she likely would have died without lifesaving resuscitation[.]" The court also found that Parents had pending felony child abuse charges arising from Nan's injuries. The court found that at supervised visits with Nan during her April to July 2023 hospitalization, Father was twice seen to leave Nan "unattended" on a hospital bed, which concerned DSS due to Nan's prior unexplained injuries. The court found that DSS and the GAL recommended reunification efforts not be continued unless Parents could offer information about how Nan was injured. The court then found and concluded that under North Carolina General Statute Section 7B-901, "aggravated circumstances exist" in that Nan "suffered chronic physical abuse and

that the severe near[-]life[-]ending injuries inflicted on the 3[-]month[-]old child which increased the enormity and added to the injurious consequences of her abuse and neglect" show "that reunification efforts shall not be required."

On 27 October 2023, Mother filed notice of appeal. Father filed notice of appeal on 27 November 2023.

## II. Father's Petition for Writ of Certiorari

On 22 February 2024, Father filed a petition for writ of certiorari in this Court, seeking review of the adjudication and disposition order. Father acknowledges that his notice of appeal was filed and served on 27 November 2023, 31 days after entry of the district court's order; Father filed the petition based on his belief that the notice of appeal was not timely filed. While Rule of Appellate Procedure 3 provides a *thirty-day* period for such filings, N.C. R. App. P. 3(c), Appellate Rule 27(a) provides that when a deadline under the Rules falls on "a Saturday, Sunday, or a legal holiday when the courthouse is closed for transactions," the deadline is extended "until the end of the next day which is not a Saturday, Sunday, or a legal holiday when then courthouse is closed for transactions." N.C. R. App. P. 27(a). The adjudication and disposition order was entered on 27 October 2023, and the thirtieth day thereafter was 26 November 2023, a Sunday. By operation of Rule 27(a), the deadline for Father's notice of appeal was extended to the end of Monday, 27 November 2023—the date it was filed. Because Father's notice of appeal was timely filed, his petition

for writ of certiorari is dismissed as moot, and we turn to the merits of Parents' arguments.

### III.   Analysis

On appeal, Parents present three arguments: whether (1) the evidence supported the district court's findings of fact, conclusions of law, and adjudication of Nan as an abused and neglected juvenile; (2) they received ineffective assistance of counsel during the adjudication part; and (3) the cessation of reunification efforts was improper given the evidence offered at disposition.

## A. Sufficiency of Evidence to Support Nan's Adjudication

Parents challenge the evidence and findings of fact relied on by the district court to adjudicate Nan an abused and neglected juvenile, but their appellate arguments take different approaches.  The order on appeal includes 16 single-spaced pages of detailed findings of fact, and neither Mother nor Father challenge any specific finding of fact as unsupported by the evidence.  Instead, Mother argues that the "findings of fact are not supported by clear, cogent, and convincing evidence where the only evidence was the verified petition and the verifier's testimony that the information in the petition was true."  Father maintains that "[t]he only 'evidence' provided by DSS during the adjudicatory proceedings was conjecture, hearsay, and double hearsay" and asserts that the court adjudicated Nan "solely on the basis of the [p]etition."  We are not persuaded by either argument.

### *1. Standard of Review and Statutory Definitions*

We review a district

> court's adjudication to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. Where no exception is taken to a finding of fact by the [district] court, the finding is presumed to be supported by competent evidence and is binding on appeal. Conclusions of law made by the trial court are reviewable de novo on appeal.

*In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (citations and quotation marks omitted). In undertaking this review, we are mindful that "it is well-established that a district court has the responsibility to pass upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom." *In re A.R.A.*, 373 N.C. 190, 196, 835 S.E.2d 417, 422 (2019) (citation, quotation marks, and brackets omitted).

In abuse, neglect, and dependency proceedings, the petitioner has the burden of proving the petition's allegations. N.C. Gen. Stat. § 7B-805 (2023). Thus, in this case, DSS had to "fully convince" the district court of the truth of the petition's allegations necessary to support the adjudication of Nan as an abused and neglected juvenile. *See In re J.N.*, 381 N.C. 131, 136, 871 S.E.2d 495, 499 (2022).

"An abused juvenile is defined, in pertinent part, as one whose parent, guardian, custodian, or caretaker inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means." *In re K.L.*, 272 N.C. App. 30, 39, 845 S.E.2d 182, 190 (2020) (quoting N.C. Gen. Stat. § 7B-101(1)) (quotation marks and brackets omitted). "This Court has previously upheld adjudications of

abuse where a child sustains non-accidental injuries, even where the injuries were unexplained, where clear and convincing evidence supported the inference that the respondent-parents inflicted the child's injuries or allowed them to be inflicted." *Id.* (citation, quotation marks, and brackets omitted).

A juvenile is neglected if her parents "[do] not provide proper care, supervision, or discipline[ or c]reate[ ] or allow[ ] to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15) (2023).

> Traditionally, there must be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline in order to adjudicate a juvenile neglected. In neglect cases involving newborns, the decision of the [district] court must [often] be predictive in nature, as the [district] court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case.

*In re K.S.*, 380 N.C. at 64-65, 868 S.E.2d at 4 (citations, quotation marks, and brackets omitted).

### 2. *Mother's Argument*

As to Mother's position that "'[t]en words and a petition' is not clear and convincing evidence," our Supreme Court addressed a similar argument in a recent appeal arising from a termination of parental rights proceeding. *See In re Z.G.J.*, 378 N.C. 500, 862 S.E.2d 180 (2021). In that case,

> [d]uring the adjudication phase, [an Iredell County DSS social worker] was the only witness, and she testified that she would adopt the allegations in the termination petition

> as her testimony. There were no objections to entering the petition into the record, and respondent's counsel declined to cross-examine [the social worker]. At the conclusion of the adjudicatory phase, the [district] court rendered its decision that grounds existed to terminate respondent's parental rights.

*Id.* at 503-04, 862 S.E.2d at 184. Specifically, at the hearing, the social worker identified herself and then testified that 1) she had verified the petition, 2) its contents were "true and accurate," and 3) she "[w]ould . . . adopt those contents as [her] testimony today." *Id.* at 506-07, 862 S.E.2d at 186. Here, counsel for Mother and Father specifically stated they had no objection to the trial court receiving the verified petition as evidence after the social worker's testimony and both declined their opportunity to cross-examine the social worker.

In *In re Z.G.J.*, the mother argued "that DSS's proffer of evidence amounted to submitting the allegations from its verified petition as its only adjudication evidence," noting cases in which this Court had "reversed juvenile orders that were based solely on documentary evidence[.]" *Id.* at 507, 862 S.E.2d at 186 (citations omitted). The Supreme Court distinguished those earlier Court of Appeals cases from the matter before it, noting "the salient difference": "live witness testimony" from a social worker who "orally reaffirmed, under oath, all of the allegations from the termination petition." *Id.* at 507-08, 862 S.E.2d at 187. In holding that the district court's reliance on the social worker's brief oral testimony was not error, the Supreme Court emphasized that the "[r]espondent was given the opportunity to cross-examine [the

social worker] with respect to any of the[ ] allegations, and she declined to do so." *Id.* at 508, 862 S.E.2d at 187.

Mother argues that *In re Z.G.J.* does not control in this matter for two reasons. She first attempts to distinguish the testimony here from that in *In re Z.G.J.* because "Early did not *adopt* the petition's allegations as her testimony[, but] merely testified the information in the petition was true." (Emphasis added.) Second, Mother maintains that "the respondent in [*In re*] *Z.G.J.* did not challenge the sufficiency of the evidence to support the findings, so the Supreme Court did not hold the evidence in [that case] clearly and convincingly supported the [district] court's findings." Neither position is availing.

As to the first, nothing in the Supreme Court's opinion suggests that a witness who has testified to the truth and accuracy of the contents of a juvenile petition admitted into evidence also must agree that she "adopts" the contents for a district court to properly rely on the contents of the petition as evidence. As just noted, the Court in *In re Z.G.J.* focused on the importance of having a "live witness" testify to the truth of the contents of the petition and be available for cross-examination by the respondent or questioning by the district court. *Id.* at 507, 862 S.E.2d at 187. Here, Parents had the opportunity to object to admission of the petition and to Early's testimony and both declined to cross-examine her. Parents could have attempted to impeach Early's credibility or disputed the factual assertions in the petition. But like the respondent in *In re Z.G.J.*, they elected not to do so. *See id.*

As to the second purported distinction offered by Mother—that the sufficiency of the evidence was not argued by the respondent and thus not addressed by the Court in *In re Z.G.J.*—Mother has not identified any specific findings of fact in the adjudication order she challenges as unsupported. Rather, she makes only a general assertion that "[n]o reasonable trier of fact could conclude that [the] evidence [in this matter] meets the higher standard of proof required[,]" that is, "clear, cogent and convincing evidence," *In re K.S.*, 380 N.C. at 64, 868 S.E.2d at 4, that "fully convince[s]" the district court, *In re J.N.*, 381 N.C. at 136, 871 S.E.2d at 499.

The pertinent evidence in the juvenile petition included the facts as summarized above in this opinion. Specifically, Father was observed handling Nan roughly twice while she was in the NICU and in a medically fragile state, once after being specifically instructed on that topic and entering into a safety plan; Parents were each asked to leave the NICU due to their failure to adhere to protocols; one week after Nan was discharged from the NICU into Parents' sole care, they brought Nan to an ER where she stopped breathing and had to be revived multiple times; Nan was discovered to have three skull fractures, bleeding on the brain and spine, other brain and spinal injuries, and retinal hemorrhages; a physician described the injuries as "abusive head trauma" resulting in "a near-fatality event for [Nan]"; and Parents acknowledged that they were Nan's sole caregivers when she was injured but could not explain how her injuries occurred. That evidence was sufficient to support the essential findings of fact which in turn support the court's adjudication.

### 3. *Father's Arguments*

Father also contends that the evidence offered in the adjudication portion of the hearing was insufficient to support the allegations in the petition. Specifically, he asserts that 1) "[t]he only 'evidence' provided by DSS during the adjudicatory proceedings was conjecture, hearsay, [and] double hearsay"; 2) "DSS failed to provide evidence in support of the allegations . . . [or] expert witnesses to support the medical speculation" in the petition; and 3) Parents' inability to explain Nan's injuries cannot, standing alone, support the "court's conclusion that [they] are responsible for the juvenile's injuries."

To the extent that Father's first argument concerns the admissibility of Early's testimony or the petition at the hearing, Father did not preserve that contention for our review by making a timely objection to either. *See* N.C. R. App. P. 10. Instead, Father's counsel specifically stated he had no objection to the trial court's acceptance of the petition as evidence, based upon Early's testimony, and declined the opportunity to cross-examine Early. If Father suggests that the evidence was not clear and convincing and thus was insufficient to support the adjudication of Nan as an abused and neglected juvenile, we reject that argument for the same reason we rejected Mother's similar argument: he has not identified any specific findings of fact he contends are not supported by the evidence. Likewise, his second argument fails because, as just explained, the contents of the petition as "orally reaffirmed, under

oath" by Early constituted evidence upon which the district court was entitled to rely. *In re Z.G.J.*, 378 N.C. at 508, 862 S.E.2d at 187.

His third argument also lacks merit as it mischaracterizes both the evidence adduced at the adjudication hearing and the district court's resulting findings and conclusions. The district court did not find or conclude that Parents caused Nan's injuries; instead, the court found Nan suffered severe, life-threatening injuries while in the sole care of Parents and they each denied having caused or having knowledge of the cause of Nan's injuries.

Moreover, the district court did not adjudicate Nan an abused and neglected juvenile *solely* based on its findings that Parents could or would not explain Nan's injuries. Rather, the court also found that Father had twice previously handled Nan "roughly or inappropriately"; Nan appeared "to be in good health" during a DSS visit to the home on 17 April 2023, and yet when Parents brought Nan to the ER two days later, she had multiple skull fractures, bleeding on the brain, and other injuries, and needed to be resuscitated several times; and Parents acknowledged that they "were the only people providing care to" Nan during the period when she sustained her injuries. As Father concedes, a child's unexplained, non-accidental injuries can sustain an abuse adjudication "where clear and convincing evidence support[s] the inference that the respondent-parents inflicted the child's injuries or allowed them to be inflicted." *In re K.L.*, 272 N.C. App. at 39, 845 S.E.2d at 190 (citation, quotation marks, and brackets omitted). The additional evidence here supported the district

court's inference that Parents were responsible for causing, or allowing, Nan's severe injuries, and in turn, its adjudication.

**B. Ineffective Assistance of Counsel**

Parents next argue that they received ineffective assistance of counsel during the adjudication portion of the 23 October 2023 hearing. We disagree.

Parents have a statutory right to counsel in an abuse, neglect, or dependency case, N.C. Gen. Stat. § 7B-602(a) (2023), which encompasses the right to the effective assistance of counsel. *In re T.N.C.*, 375 N.C. 849, 854, 851 S.E.2d 29, 32 (2020) ("Counsel necessarily must provide effective assistance, as the alternative would render any statutory right to counsel potentially meaningless." (citation omitted)). To prevail on a claim of ineffective assistance of counsel, a parent must show "counsel's performance was deficient or fell below an objective standard of reasonableness" that denies the parent a fair hearing. *In re J.A.A.*, 175 N.C. App. 66, 74, 623 S.E.2d 45, 50 (2005). Thus, to prevail, a parent must demonstrate prejudice—a "reasonable probability" that counsel's deficient performance led to a "different result in the proceedings." *In re C.B.*, 245 N.C. App. 197, 213, 783 S.E.2d 206, 217 (2016) (citation and quotation marks omitted).

Mother emphasizes that, during adjudication, her "attorney did not ask any questions, did not raise any objections, did not present any evidence, did not move to dismiss, and did not make any argument." Father contends that his counsel "said and did nothing at adjudication to advocate for . . . Father," such that, "but for his

errors, the [district c]ourt would have had to dismiss DSS'[s] case at the end of DSS'[s] evidence."

"It is well established that attorneys have a responsibility to advocate on the behalf of their clients." *In re S.N.W.*, 204 N.C. App. 556, 560, 698 S.E.2d 76, 79 (2010) (citation omitted). However, "[c]ounsel's failure to advocate for [a respondent-parent] is not necessarily an indication of ineffective assistance of counsel." *In re C.D.H.*, 265 N.C. App. 609, 613, 829 S.E.2d 690, 693 (2019). In some cases, such a choice by counsel may be the result of strategy or because "resourceful preparation reveal[ed] nothing positive to be said for" the respondent-parent in a particular hearing. *Id.* (citation and quotation marks omitted). "There is a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. Counsel is given wide latitude in matters of strategy, and the burden to show that counsel's performance fell short of the required standard is a heavy one for a party to bear." *In re L.N.H.*, 382 N.C. 536, 541-42, 879 S.E.2d 138, 143 (2022) (citations, quotations marks, and brackets omitted).

We note that at the time of the October 2023 hearing, Parents each had two pending felony child abuse charges arising from Nan's injuries, a circumstance which may have contributed to their decisions to "stand mute" during the hearing and to their attorneys' choice not to contest the evidence offered by DSS during the adjudication portion of the hearing. Although counsel for Parents did not contest the evidence offered by DSS or present any evidence or arguments on Parents' behalf at

*adjudication,* they actively participated on their clients' behalf during the dispositional phase of the hearing. On disposition, counsel displayed a thorough understanding of the facts and legal issues pertinent to the matter as they cross-examined witnesses, lodged objections, and made arguments to the court.[2]

Our review of the entire hearing transcript suggests that counsel for Parents adopted a strategy to not contest the adjudication of Nan as an abused and neglected juvenile, and to instead focus their efforts on persuading the district court to continue reunification efforts in the disposition phase. For example, in her closing argument to the court on disposition, counsel for Mother began by urging the court "to not cease reunification efforts immediately," noting that Mother "was at work when [Nan] was injured" and thus "does not know what happened to" the child. Counsel for Father stated that he could offer no explanation for Nan's injuries—although he noted that they occurred at a "very stressful time for both parents"—but also urged the court not to make the statutory findings which would permit DSS to cease reunification efforts. Based on the advocacy displayed by counsel during the disposition phase, it does not appear that the performance of counsel for Parents "was deficient or fell below an objective standard of reasonableness[.]" *In re J.A.A.,* 175 N.C. App. at 74, 623 S.E.2d

---

[2] This circumstance distinguishes the performance of counsel here from that in *In re T.D.*, No. COA15-1393, 248 N.C. App. 366, 790 S.E.2d 752 (2016) (unpublished), a case cited by Mother. In that case, after emphasizing that the respondent-parent's counsel "made absolutely no contribution to the proceedings and in no way advocated on her behalf at the hearing" in "either the adjudication or the disposition stage of the hearing," this Court remanded to the district court for a determination of whether counsel's performance was deficient and if so whether it prejudiced the respondent-parent. *Id.*, slip op. at 5-6.

at 50; *see also In re L.N.H.*, 382 N.C. at 541-42, 879 S.E.2d at 143; *In re C.D.H.*, 265 N.C. App. at 613, 829 S.E.2d at 693.

In addition, even if we were to assume the silence of Parents' counsel at adjudication was deficient performance, Parents cannot demonstrate that they were deprived of a "fair hearing" or that but for counsel's performance, there would have been a "different result in the proceedings." *In re C.B.*, 245 N.C. App. at 213, 783 S.E.2d at 217 (citations and quotation marks omitted). As previously discussed, adjudications may be upheld where a juvenile suffers "non-accidental injuries, even where the injuries were unexplained, where clear and convincing evidence supported the inference that the parents inflicted the child's injuries or allowed them to be inflicted." *In re K.L.*, 272 N.C. App. at 39, 845 S.E.2d at 190 (citation, quotation marks, and brackets omitted). In *In re L.Z.A.*, this Court upheld the abuse adjudication of an infant who sustained brain injuries and a skull fracture a medical expert believed resulted from "non-accidental trauma" while in the sole care of the parents who could not explain the injuries. 249 N.C. App. 628, 637, 792 S.E.2d 160, 168 (2016); *see also In re Y.Y.E.T.*, 205 N.C. App. 120, 127, 695 S.E.2d 517, 522 (2010) (upholding termination of parental rights where an infant suffered unexplained injuries while in the parents' sole care).

Given that Father had twice been seen to handle Nan roughly, Parents had been asked to leave the NICU for failure to follow its protocols, and while in the sole care of Parents, Nan suffered multiple unexplained, non-accidental injuries that were

nearly fatal and required her hospitalization for several months, we conclude that there is not a "reasonable probability" that any different performance by Parents' counsel would have led to a "different result in the [adjudication] proceeding[ ]." *In re C.B.*, 245 N.C. App. at 213, 783 S.E.2d at 217. Accordingly, Parents' ineffective assistance of counsel arguments are overruled.

## C. Reunification Efforts

Finally, Parents contend that the district court erred and abused its discretion by not requiring DSS continue reunification efforts at the initial disposition hearing. With this argument, we agree.

Where an order ceases efforts to reunify a juvenile with her parents, we must "determine whether the [district] court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the [district] court's conclusions, and whether the [district] court abused its discretion with respect to disposition." *In re C.M.*, 273 N.C. App. 427, 429, 848 S.E.2d 749, 751 (2020).

At an initial disposition hearing, if a district court "places a juvenile in the custody of a county department of social services, the court shall direct that reasonable efforts for reunification . . . *shall not be required* if the court makes written findings of fact," *inter alia*, "that aggravated circumstances exist." N.C. Gen. Stat. § 7B-901(c)(1) (2023) (emphasis added). The two statutorily specified aggravated circumstances found by the district court here were that Parents "committed . . . or

allowed" 1) "[c]hronic physical . . . abuse" and 2) "[a]ny other act, practice, or conduct that increased the enormity or added to the injurious consequences of the abuse or neglect." N.C. Gen. Stat. § 7B-901(c)(1)(b), (f). Our Supreme Court has held that a district "court's mere declaration that there are aggravating circumstances that exist, without explaining what those circumstances are, is not sufficient to constitute a valid finding for purposes of N.C.G.S. § 7B-901(c)." *In re L.N.H.*, 382 N.C. at 547, 879 S.E.2d at 146 (citation and quotation marks omitted).

Parents first emphasize that no evidence before the court suggested, and no dispositional findings were made, that they committed or allowed "chronic" abuse of Nan—that is, abuse which was repeated or sustained over time. *See* N.C. Gen. Stat. § 7B-901(c)(1)(b). In *In re B.L.M.-S.*, ___ N.C. App. ___, ___, 901 S.E.2d 687, 692 (2024), this Court noted that "[t]he term chronic, although not defined in section 7B, is commonly defined as 'lasting a long time or recurring often[.]'" This Court affirmed a dispositional order in which the district court concluded that reunification efforts were not required due to a finding of chronic abuse where the findings of fact included that the two-month-old juvenile had unexplained, non-accidental injuries including two rib fractures at different stages of healing, indicating that the *injuries were inflicted at different times*, and the father admitted that, out of frustration, he had squeezed the juvenile and shaken him *on more than one occasion* and also had tossed the child into the air and "fumbled or dropped" him. *Id.* at ___, 901 S.E.2d at 691. These findings supported "the court's conclusion that [the] respondent-father

committed or encouraged and/or allowed the chronic physical abuse of the juvenile." *Id.* at ___, 901 S.E.2d at 692 (quotations marks and ellipses omitted).

Here, in contrast, the district court's dispositional findings of fact—regarding Nan's unexplained, near-fatal, non-accidental injuries sustained while in the sole care of Parents, resulting in the need for follow-up care from speech therapy, physical therapy, occupational therapy, neurosurgery, neurology, pediatric surgery, and other pediatric professionals—demonstrate serious abuse and suggest significant concerns about Parents' ability to provide safe and appropriate care for Nan. But there are no findings indicating recurring acts of physical abuse or abuse lasting over a long period of time and thus are not *chronic* abuse. N.C. Gen. Stat. § 7B-901(c)(1)(b). Rather, the findings show a single, albeit severe, incident of physical abuse while Nan was in the sole care of Parents sometime between 17 April 2023, when Early visited the home and found Nan "sleeping but appearing to be in good health" and 19 April 2023, when Nan presented at the ER and "stopped breathing and required CPR multiple times." Nan had "multiple skull fractures and bleeding on the brain" but nothing in the record suggests that Nan had healing fractures caused earlier or injuries sustained on multiple occasions as in *In re B.L.M.-S. See In re B.L.M.-S.,* ___ N.C. App. at ___, 901 S.E.2d at 691. Although the hospital had concerns regarding Parents' handling of Nan when she was in the NICU, the findings do not indicate any injury to Nan during that time and Nan was discharged from the hospital into the care of Parents. None of the findings of fact describe ongoing or repeated abuse.

Thus, the findings of fact do not support the trial court's conclusion that "aggravated circumstances exist based upon the abuse and neglect of this infant child by her parents" under North Carolina General Statute Section 7B-901(c)(1)(b) was properly found. *See* N.C. Gen. Stat. § 7B-901(c).

Parents next contend that the evidence did not show, nor did the court make findings explaining how their conduct "increased the enormity or added to the injurious consequences of the abuse [or] neglect" of Nan, suggesting that the district court "conflated 'consequences of acts' with 'acts.'" *See In re L.N.H.*, 382 N.C. at 547, 879 S.E.2d at 146; *see also* N.C. Gen. Stat. § 7B-901(c)(1)(f). The required finding under North Carolina General Statute Section 7B-901(c)(1)(f) to sustain the finding of an aggravated circumstance—"conduct [that] increased the enormity or added to the injurious consequences"—requires that "the evidence in aggravation involve something *in addition to the facts that* [*give*] *rise to the initial adjudication of abuse* and/or neglect." *Id.* at 547-48, 879 S.E.2d at 146 (emphasis added) (quotation marks omitted). For that reason, in *In re L.N.H.*, the Supreme Court rejected a department of social services argument "that [the] respondent-mother's conduct in burning [the juvenile's] feet and leaving her on the porch increased the enormity and added to the injurious consequences of burning [the juvenile's] feet and leaving her on the porch," even though the juvenile's "injuries were severe enough to require hospitalization for two days and continued medical treatment for several weeks[.]" *Id.* at 547, 879 S.E.2d at 146.

Likewise, here the evidence and findings of fact regarding Nan's serious condition and near-fatal injuries upon her arrival at the ER on 19 April 2023, along with her subsequent three-month hospitalization and ongoing medical and therapy needs, all arise from the same facts that support the abuse and neglect adjudications—her serious, life-threatening condition and injuries upon her arrival at the ER on 19 April 2023. Nothing in the record indicates that Parents' "conduct increased the enormity or added to the injurious consequences" of Nan's abuse "in addition to the facts that [gave] rise to the initial adjudication of abuse and/or neglect." *Id.* at 547-48, 879 S.E.2d at 146.

We vacate the portion of the adjudication and initial disposition order directing that reunification efforts with Parents are not required. However, as in *In re L.N.H.*, we note that "there *is* sufficient evidence in the record to support a determination . . . that reunification efforts were not required pursuant to N.C.G.S. § 7B-901(c)(3)(iii), which allows the cessation of reunification efforts in an initial dispositional order in the event that the parent has committed a felony assault resulting in serious bodily injury to the child." *Id.* at 548, 879 S.E.2d at 147 (emphasis in original) (quotation marks and brackets omitted) (discussing the fact that the "respondent-mother was arrested and charged with felony child abuse inflicting serious injury" in connection with the juvenile's injuries, which along with "ample evidence that tends, if believed, to show that [the] respondent-mother's actions . . . involved the commission of a felonious assault upon the child that resulted in serious bodily injury[,]" would permit

"the findings necessary to permit the cessation of reunification efforts"). As noted above, Parents were each charged with felony child abuse in connection with Nan's injuries. "As a result, we . . . remand to the [district] court with instructions to enter appropriate findings addressing the issue of whether efforts to reunify [Parents] with [Nan] should be ceased pursuant to N.C.G.S. § 7B-901(c)." *Id.* (citation omitted).

## IV. Conclusion

For the reasons discussed herein, we hold that the district court did not err in adjudicating Nan an abused and neglected juvenile. We also reject Parents' ineffective assistance of counsel arguments. But we vacate the district court's dispositional direction that reunification efforts with Parents are not required and remand this matter to the district court for the entry of an order with appropriate findings of fact on that issue.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

Judges FLOOD and STADING concur.