IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-565

Filed 4 March 2026

Cabarrus County, Nos. 24JA000010-120, 24JA000011-120

IN THE MATTER OF: J.R.D.L.G. &  S.L.K.D.L.G.

Appeal by respondents from judgments entered 23 January 2025 and 22 February 2025 by Judge Nathaniel M. Knust in Cabarrus County District Court. Heard in the Court of Appeals 28 January 2026.

> *Robinson & Lawing, LLP, by Christopher M. Watford, for the respondent-appellant-father.*
>
> *Reece & Reece, by Mary McCullers Reece, for the respondent-appellant-mother.*
>
> *Administrative Office of the Courts, by NC GAL Appellate Counsel Matthew D. Wunsche, for guardian ad litem.*
>
> *Hartsell & Williams, P.A., by Kimberly B. Kisner, for the petitioner-appellee.*

DILLON, Chief Judge.

Respondent-Mother and Respondent-Father appeal from initial adjudication and disposition orders entered 23 January 2025 and 22 February 2025, which adjudicated their youngest minor child as abused and neglected and their older child as neglected.  We affirm the trial court's orders.

I.    Background

Respondents are the natural parents of J.D.L.G. ("Joseph") and S.D.L.G.

("Sarah").[1]

The children lived with Respondents and their maternal grandmother. Mother delivered Sarah at her home with two midwives and a doula present. Mother labored for thirty-five hours, and Sarah was born in a frank breech position. Sarah presented through the birth canal folded in half, buttocks first.

Later Respondents noticed Sarah, who was generally a "calm" baby, was "fussier than normal." When Mother gently lifted Sarah's right leg, she cried. Respondents then took Sarah to the Emergency Department at Atrium Health-Cabarrus County.

Sarah underwent ultrasound and x-rays. Atrium diagnosed Sarah with fractures of both clavicles, several ribs, corner fractures of the proximal and distal tibia, bilateral corner fractures of the distal femurs, and a non-displaced fracture of the right mid-femur. The fractures were in various stages of healing and Sarah was transferred to Levine Children's Hospital in Charlotte.

Dr. Nicole Barrett, M.D., was the attending physician on the child protection team at Levine Children's Hospital and one of the medical providers who treated Sarah. Dr. Barrett met with Respondents and examined Sarah. Dr. Barrett noticed Sarah's right leg was in a "flexed and externally rotated position." Dr. Barrett ruled out brittle bone, rickets, and *osteogenesis imperfeta*. She could not diagnose Sarah

---

[1] *See* N.C. R. App. P. 42(b) (pseudonym used to protect the identity of minors).

with Ehlers-Danlos Syndrome nor rule it out because she opined diagnostic protocol for the syndrome begins at age five. Laboratory and genetic testing did not reveal any bone disorder or other natural causes for Sarah's injuries. Dr. Barrett noted Sarah had a subconjunctival hemorrhage on her eye and a blue and purple bruise on her right leg. Mother told Dr. Barrett she thought the bruise on Sarah's right leg was the result of a bug bite.

Dr. Barrett believed Sarah's clavicle fractures at six weeks could be attributed to birth trauma. Dr. Barrett observed Sarah had multiple fractures on both sides of her body in at least three different stages of healing and opined, "the types of fractures that she has are highly specific or inflicted injury." Dr. Barrett testified corner fractures are from either a pulling, twisting, or shaking and concluded they have a "high specificity for abuse or inflicted injury[.]" Dr. Barrett opined the rib fractures occurred from blunt force trauma to the rib cage or anterior or posterior compression of the spine. Dr. Barrett concluded the rib fractures would not occur through the routine handling of an infant or from a simple fall. Dr. Barrett further concluded Sarah's spiral pattern femur fracture with a twisting motion was caused by a pulling or torquing of the bone and was not consistent with an accidental injury in an infant her age.

Dr. Barrett, in her opinion, did not believe Sarah's injuries, other than the clavicle fractures, had resulted from the forces exerted at her delivery and birth. Dr. Barrett based her opinion on Sarah's birth purportedly being "non-traumatic"

- 3 -

because it did not involve extraction of Sarah from the birth canal with forceps or by using a vacuum. Dr. Barrett's opinion concluded Sarah's six-week injuries, other than the clavicle fractures, were "consistent with inflicted trauma."

Respondents acknowledged they and Grandmother were Sarah's only parental and familial caregivers and custodians in her first six weeks after birth until she went to the Levine Children's Hospital. Respondents and Grandmother denied intentionally or negligently hurting Sarah, but, other than the at-home delivery and her frank breech position at birth, they could not explain Sarah's injuries except through treating physicians and expert testimony.

The children were temporarily placed in a safety placement with their paternal grandparents upon Sarah's discharge from Levine Children's Hospital. Respondents were allowed to move into the home with the paternal grandparents, however, their presence with the children was to be supervised at all times.

On 18 January 2024, Cabarrus County Department of Health and Human Services ("CCDHS") filed juvenile petitions alleging Sarah was abused and neglected and Joseph was neglected. Respondents' counsel tendered and had admitted Dr. Michael Holick, M.D., Ph.D, as a board-certified medical expert without objection. Dr. Holick testified and opined Respondents had Ehlers-Danlos Syndrome, a genetic disorder, and Sarah had a 75% likelihood of having Ehlers-Danlos Syndrome based upon her genetics alone. The trial court, however, found Dr. Holick's testimony uncredible, and also expressly found "no credible evidence showing any of [Sarah]'s

- 4 -

injuries were caused or connected to any known or possible medical condition."

The district court adjudicated Sarah to be abused and neglected and Joseph neglected on 22 January 2025. Respondents appeal.

## II.    Standard of Review

"An appellate court reviews a trial court's adjudication to determine whether the findings are supported by clear . . . and convincing evidence and the findings support the conclusions of law." *In re G.C.*, 384 N.C. 62, 65 (2023) (citation omitted).

It is well settled that findings, if supported by clear and convincing evidence, "are deemed conclusive, even where some evidence supports contrary findings." *In re J.A.M.*, 370 N.C. 464, 464 (2018) (citations omitted). Unchallenged findings of fact are presumed to be supported by sufficient evidence and are binding on appeal. *In re J.M.*, 384 N.C. 584, 591 (2023). We review the trial court's conclusions of law de novo. *In re G.C.*, 384 N.C. at 66 (citations omitted).

## III.    Adjudication of Sarah

An "[a]bused" juvenile is one "whose parent, guardian, custodian, or caretaker" either "[i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means." N.C.G.S. § 7B-101(1)(a). A "[n]eglected" juvenile is one "whose parent, guardian, custodian, or caretaker" engages in certain statutorily defined criteria, including failing to "provide proper care, supervision, or discipline" or "[c]reat[ing] or allow[ing] to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15)(a), (e). "The allegations in a petition

alleging that a juvenile is abused, neglected, or dependent shall be proved [by the petitioner] by clear and convincing evidence." N.C. Gen. Stat. § 7B-805.

Mother and Father independently argue several of the district court's findings and conclusions are not supported by clear and convincing evidence or by supported findings of fact. We disagree.

While Respondents challenge several findings of fact, we believe the unchallenged findings support the trial court's conclusions of law, even assuming the challenged findings were not supported by competent evidence.[2] In addition to the trial court's unchallenged findings regarding Sarah's medical examinations and the results thereof, we find relevant the following unchallenged, *and thus binding*, findings of fact:

> 25. *[Sarah] was in the sole care and control of her parents in October 2023 per the testimony of the mother*, [ ], and on October 31, 2023, [Sarah] was taken to the Atrium Cabarrus ER due to signs of pain when [Sarah]'s leg was touched and/or manipulated. [Sarah] had X-Rays taken at the ER and it was determined based on those X-Rays that [Sarah] had numerous fractures in different stages of healing. On November 1, 2023, [Sarah] was then sent to Atrium Levine's Children's Hospital due to her injuries *being highly suspicious for non-accidental trauma* and for further examination. . . . [Sarah]'s bone density tests came back as normal bone mineralization, all her labs were

---

[2] Finding of Fact 21 provides: "Upon information and belief mother, father and maternal grandmother inflicted the injuries or allowed them to be inflicted on [Sarah] by unexplained non-accidental trauma." This finding, however, cannot serve as an affirmative finding to support the trial court's conclusions. *See In re J.C.M.J.C.*, 268 N.C. App. 47, 58 (2019) (explaining that findings based "[u]pon information and belief" "do not constitute affirmative findings of fact that would support a conclusion that the children are neglected").

normal, her additional radiographs were normal and *there were no other indicators that [Sarah] had any other disease or disorder that could have caused the fractures. . . .* [Sarah] did see multiple pediatric doctors during this time, and *it was determined that [Sarah] did not have any genetic issues which would cause her to have her bones broken more easily.*

. . . .

29. Since the children were placed with a temporary safety provider, the paternal grandparents, on October 31, 2023, until the date the petition was filed on January 18, 2024, there were no findings of any further fractures or injuries . . . . *Since the paternal grandparents have been caring for [Sarah], she has not suffered any further breaks or fractures. . . .*

. . . .

31. Dr. Barrett's testimony as an expert and her opinion supports the findings that [Sarah]'s injuries were consistent with non-accidental trauma and that *the Court finds that [Sarah] was exposed to physical abuse while in the care and control of her parents up until [Sarah] was admitted to the hospital. As a result [Sarah] suffered 16 fractures that are consistent with non-accidental trauma and has unexplained non-accidental injuries that are consistent with abuse resulting from being in the care of the mother, father, and/or caretaker.*

(Emphasis added).

These findings prompted the trial court to enter the following conclusion of law and ultimate finding:

34. The allegations contained in the petition support a finding that [Sarah] is abused and neglected. The status of the juvenile has been determined to be abused and neglected in that the juvenile's parent, guardian, custodian or caretaker has inflicted or allowed to be inflicted on the

juvenile serious physical injury by other than accidental means, the juvenile's parent, guardian, custodian or caretaker has created or allowed to be created a substantial risk of serious physical injury to the juvenile by other than accidental means, the juvenile's parent, guardian, custodian, or caretaker does not provide proper care, supervision or discipline, the juvenile's parent, guardian, custodian, or caretaker has not provided or arranged for the provision of necessary medical care, and the juvenile's parent, guardian, custodian or caretaker creates or allows to be created in a living environment that is injurious to the juvenile's welfare.[3]

"This Court has previously upheld abuse adjudications where a child sustains unexplained, non-accidental injuries[,]" even in the absence of "a pattern of abuse or the presence of risk factors." *In re L.Z.A.*, 249 N.C. App. 628, 637 (2016). Based on the evidence offered at the hearing, the trial court determined that Sarah's injuries were unexplained, non-accidental, and occurred in Respondents' or Grandmother's care. Therefore, the trial court's findings (evidentiary and ultimate) support the trial court's conclusion that Sarah was abused.

Respondents rely on *In re K.L.*, 272 N.C. App. 30 (2020). There, this Court reversed an adjudication of abuse and neglect of a three-month old where:

> The trial court was rightly concerned that [the respondents] were unable to explain [the juvenile]'s fractures. But, that alone, as a matter of law, cannot support the trial court's conclusion that [the respondents]

---

[3] Father contends this finding is a conclusion of law because this Court has held that "[w]hether a child is abused or neglected is a conclusion of law." *See In re Ellis*, 135 N.C. App. 338, 340 (1999). We agree that the first sentence of "Finding" 34 is a conclusion of law but conclude that the second sentence is properly characterized as an ultimate finding of fact. *See In re G.C.*, 384 N.C. at 67 (concluding that findings reciting the statutory language of G.S. 7B-101(15) are "properly characterized as ultimate findings").

> were responsible for [the juvenile]'s injuries. There is nothing to bridge the evidentiary gap between the unexplained injuries here and the conclusion that [the respondents] inflicted them, and, in fact, much of the evidence is in tension with that conclusion.

*In re K.L.*, 272 N.C. App. at 46-47 (footnote omitted). Accordingly, there must be a bridge between Sarah's unexplained injuries and the conclusion that Respondents inflicted the injury on Sarah. *See id.* at 40 ("[T]hough the exact cause of the child's injury was unclear, the trial court's findings of fact—or other evidence in the record—supported the inference that the respondent-parents were responsible for the unexplained injury.").

The unchallenged findings establish Respondents and Grandmother were Sarah's sole caretaker and that Sarah suffered "unexplained non-accidental injuries." Moreover, when examined, Sarah's injuries were in various stages of healing and Sarah did not show any signs of injuries after being placed in a safety placement with her paternal grandparents. Thus, contrary to Respondents' suggestion, these findings provide the necessary bridge between Sarah's injuries and the trial court's conclusion.

These same findings also supports the trial court's conclusion of law that Sarah was neglected. *See In re L.Z.A.*, 249 N.C. App. at 638 ("Here, the evidence supporting the abuse adjudication also supports the neglect adjudication.").

IV.    Adjudication of Joseph

- 9 -

Next, Respondents argue the district court erred by concluding Joseph was a neglected juvenile based upon his newborn sister's unexplained fractures.

Relevant here, the trial court found:

> 23. [Joseph] would live in a home where another juvenile has been abused or neglected.
>
> 30. [Joseph] lives in a home where another juvenile has been abused or neglected.

Respondent argues these findings are partially conclusions of law, but held above, Sarah was adjudicated as abused and neglected and thus the conclusions are supported. Additionally, Father concedes the factual component of these quasi-findings, that Joseph lived and would live with Sarah.

The trial court went on to conclude that Joseph was neglected and provided the ultimate finding that Respondents and Grandmother "[do] not provide proper care, supervision or discipline and . . . create[ ] or allow[ ] to be create a living environment that is injurious to [Joseph's] welfare."

Our Supreme Court recently examined the adjudication of a sibling of an infant with unexplained fractures in *In re E.H.*:

> In these cases, we reaffirmed longstanding precedent holding that a "court may not adjudicate a juvenile neglected *solely* based upon previous Department of Social Services involvement relating to other children," and that there must be "the presence of other factors to suggest the neglect or abuse will be repeated." But we also recognized that those "other factors" can be circumstances surrounding the abuse itself that indicate other children in the home could face similar harm.

388 N.C. 100, 105 (2025) (emphasis in original) (citations omitted). The Court further held:

> When a child is severely abused in the parents' care, and the parents cannot provide any plausible explanation for how those injuries occurred or assure social workers that the abuse will not happen again, the trial court properly can find that there is an unacceptable risk of similar abuse to other children in that same home in the future.

*Id.* at 107 (citations and footnote omitted).

Respondents assert they did not know how or why Sarah's sixteen fractures came about in the six weeks in their exclusive care as reflected by the trial court's findings of fact which characterize the injuries as "unexplained." Additionally, Sarah's injuries were found to be the result of abuse occurring while in Respondents' and Grandmother's care and the trial court found Joseph lived and would continue to live in the environment which permitted such abuse. Thus, "there is an unacceptable risk of similar abuse to [Joseph] in that same home in the future." *See id.* In light of the trial court's evidentiary findings as well as its ultimate findings, the trial court's conclusion that Joseph is neglected is properly supported.

## V.    Conclusion

The trial court's unchallenged findings of fact support the trial court's conclusions of law. Accordingly, we affirm the trial court's orders.

AFFIRMED

Judge CARPENTER concurs.

Judge TYSON dissents by separate opinion.

TYSON, Judge, dissenting.

The majority's opinion incorrectly affirms the district court's order concluding Sarah was abused and neglected and Joseph was neglected. I vote to remand for adjudication and reconciliation and further supported findings of facts and conclusions. I respectfully dissent

## VI. Background

Respondents are the natural parents of J.D.L.G. ("Joseph") and S.D.L.G. ("Sarah") (collectively the "Children"). *See* N.C. R. App. P. 42(b) (pseudonym used to protect the identity of minors). Sarah was born 14 September 2023. Her brother, Joseph, was born 20 September 2020.

The Children lived with Respondents and their Maternal Grandmother. Grandmother moved in with Respondents and Joseph prior to Sarah's birth to "assist with [Joseph]'s needs and prepare for [Sarah]'s birth." Respondent-Mother delivered Sarah at her home with two midwives and a doula present. Respondent-Mother labored for thirty-five hours and Sarah was born in a frank breech position. Sarah presented through the birth canal folded in half, buttocks first.

Respondents kept all medical appointments and took Sarah to her pediatrician three times, to the two midwives twice, the doula once, and a lactation consultant twice after birth. Respondent-Mother took Sarah to the chiropractor six weeks after birth on 30 October 2023. Sarah was described as "fussy" during the visit with the chiropractor. The chiropractor ended the appointment early and recommended for

Respondent-Mother to continue breast feeding and for more "skin to skin" time to soothe Sarah.

The next morning, 31 October 2023, Maternal Grandmother took Joseph to school. Respondents noticed Sarah, who was generally a "calm" baby, was "fussier than normal." Respondents noticed redness and swelling on her right leg. When Respondent-Mother gently lifted Sarah's right leg, she cried. Respondents immediately took Sarah to the Emergency Department at Atrium Health-Cabarrus County around 12:30 p.m., "just to double check."

Sarah underwent ultrasound and x-rays. Sarah was diagnosed with fractures of both clavicles, several ribs, corner fracturs of the proximal and distal fibula, bilateral corner fractures of the distal femurs, and a non-displaced fracture of the right mid-femur. The fractures were in various stages of healing, and Sarah was transferred to Levine Children's Hospital in Charlotte.

Dr. Nicole Barrett, M.D. was the attending physician on the child protection team at Levine Children's Hospital and one of the medical providers who treated Sarah. Dr. Barrett is board certified in general pediatrics, board eligible in child abuse pediatrics, and a faculty member at the Wake Forest School of Medicine. She has evaluated hundreds of cases involving purported child mistreatment and child abuse. She was tendered and accepted as an expert in child abuse pediatrics at the Children's adjudication hearings without objection. Dr. Barrett is not a board-certified endocrinologist and was not admitted to testify or offer an opinion on matters

2

within that specialty.

Dr. Barrett met with Respondents and examined Sarah. Dr. Barrett noticed Sarah's right leg was in a "flexed and externally rotated position." Dr. Barrett ruled out brittle bone, rickets, and *osteogenesis imperfeta*. She could not diagnose Sarah with Ehlers-Danlos Syndrome, nor rule it out, because she opined diagnostic protocol for the syndrome begins at age five. Laboratory and genetic testing did not reveal any bone disorder or other natural causes for Sarah's injuries. Dr. Barrett noted Sarah had a subconjunctival hemorrhage on her eye and a blue and purple bruise on her right leg. Respondent-Mother told Dr. Barrett she thought the bruise on Sarah's right leg was the result of a bug bite.

Dr. Barrett believed Sarah's clavicle fractures at six weeks could be attributed to birth trauma. Dr. Barrett observed Sarah had multiple fractures on both sides of her body in at least three different stages of healing and opined, "the types of fractures that she has are highly specific or inflicted injury." Dr. Barrett testified corner fractures are from either a pulling, twisting, or shaking and concluded they have a "high specificity for abuse or inflicted injury[.]" Dr. Barrett opined the rib fractures occurred from blunt force trauma to the rib cage or anterior or posterior compression of the spine. Dr. Barrett concluded the rib fractures would not occur through the routine handling of an infant or from a simple fall. Dr. Barrett further concluded Sarah spiral pattern femur fracture with a twisting motion was caused by a pulling or torquing the bone and was not consistent with an accidental injury in an

infant her age.

Dr. Barrett opined she did not believe Sarah's injuries, other than the clavicle fractures, had resulted from the forces exerted at her delivery and birth. Dr. Barrett based her opinion on Sarah's birth purportedly being "non-traumatic" because it did not involve extraction of Sarah from the birth canal with forceps or by using a vacuum. Dr. Barrett's opinion concluded Sarah's six-week injuries, other than the clavicle fractures, were "consistent with inflicted trauma."

Respondents acknowledged they and Maternal Grandmother were Sarah's only parental and familial caregivers and custodians, other than their twelve or more visits to medical providers and staff in her first six weeks after birth until she went to the Levine Children's Hospital. Respondents and Maternal Grandmother vehemently denied intentionally or negligently hurting Sarah, but other than the difficult and prolonged delivery and her frank breech position at birth, could not explain Sarah's injuries, except through treating physicians and expert testimony. Respondents frequently received guests in their home; took Sarah on errands; took Sarah to medical providers and staff including those at Levine Children's Hospital; and, proudly showed her off with friends, coworkers, and extended family. Their actions and voluntarily seeking treatments, advice and follow-ups are entirely consistent with fit and good parenting and were in Sarah's best interests.

Cabarrus County Department of Health and Services ("CCDHS") and the Cabarrus County Sheriff's Office investigated. CCDHS instituted a safety plan,

which Respondents completely followed. At the time of the hearing, no law enforcement agency had made accusations or filed charges against either Respondents, her Maternal Grandmother, or any medical providers or others who had come into contact with Sarah.

The Children were temporally placed in a safety placement with their parental grandparents upon Sarah's discharge from Levine Children's Hospital. Respondents were allowed to move into the home with the paternal grandparents on 30 November 2025, however, their presence with Sarah was to be supervised at all times.

Respondents fully cooperated with the CCDHS' requests to make Sarah's doctor's appointments. Respondents arranged for Sarah to visit Dr. Deanna Adkins, a pediatric endocrinologist, with the Duke University Health System in January 2024. Dr. Adkins noted:

> several concerning points. [Respondent] was pregnant during the winter and not on a vitamin D supplement during the majority of her pregnancy. The infant was also not on vitamin D and was on breast milk which has lower levels of vitamin D depending on the mother's levels. The attempt at turning the baby from the breech position and the and the (sic) vaginal breech delivery with prolonged labor over 30 hours put the baby at risk for fractures at two separate times.

Dr. Adkins recommended further evaluation of the infant's liver due to elevated enzymes ALT and AST. Dr. Adkins ruled out rickets from the x-rays. Dr. Adkins noted elevated alkaline phosphatase and mildly elevated urinary creatine. Dr Adkins found no conclusive evidence of metabolic bone disease. Dr. Adkins referred

5

Sarah to "genetics and have further testing including a whole exome sequence as there are a number of other genetic causes for fragile bones other than the osteogenesis imperfecta[.]"

CCDHS filed juvenile petitions alleging Sarah was abused and neglected and Joseph was neglected on 18 January 2024. Counsel for Respondents clearly and properly put CCDHS to its burden on proof. In addition, counsel called Sarah's treating pediatrician since birth, Wendy Talley, M.D., who testified at the hearing. Dr. Talley concluded she "fe[lt] strongly that [Sarah's] fractures were the result of a medical condition and not non-accidental trauma." Dr. Talley is a fact witness with actual knowledge and was not tendered as an expert. Her credentials, knowledge, and treatments were not challenged nor impeached by the State.

Respondents' counsel also tendered and had admitted, Dr. Michael Holick, M.D., Ph.D, as a board-certified medical expert without objection. Dr. Holick is a board-certified endocrinologist at Boston University School of Medicine. Dr. Holick testified he disagrees with Dr. Barrett and other current medical consensus opining Ehlers-Danlos Syndrome cannot be diagnosed in children under the age of five. Dr. Holick testified and opined Respondents had Ehlers-Danlos Syndrome, a genetic disorder, and Sarah had a 75% likelihood of having Ehlers-Danlos Syndrome based upon her genetics alone. (T pp 349-50, 357, Doc. Ex. pp 127-34)

Dr. Holick testified Ehlers-Danlos syndrome is a group of inherited disorders, which affect connective tissues, primarily skin, joints and blood vessel walls. He

6

stated connective tissue is a complex mixture of proteins and other substances, which provide strength and elasticity to the underlying structures in a body. Sufferers who have Ehlers-Danlos syndrome usually exhibit overly flexible joints and stretchy, fragile skin. If a wound requires sutures or stitches, the skin of a person with the syndrome often is not strong enough to hold them.

A more severe form, vascular Ehlers-Danlos syndrome, can cause the walls of blood vessels, intestines or uterus to rupture. Because vascular Ehlers-Danlos syndrome presents serious potential complications in pregnancy, seeking a genetic counselor prior to starting a family is advised.

Dr. Holick testified the most common signs of the symptom include: (1) Overly flexible joints. The connective tissue holding joints together is looser, allowing joints to move far past the normal range of motion: (2) Joint pain and dislocations are common; (3) Stretchy skin; (4) Weakened connective tissue allows skin to stretch to a greater degree than normal. A provider can pull a pinch of skin up away from flesh, but it will snap right back into place when let go. The skin might also feel exceptionally soft and velvety to touch; and, (5) Fragile skin. Damaged skin often does not heal well. Stitches used to close a wound often will tear out and leave a gaping scar. These scars may look thin and crinkly.

Based upon the diagnosis of Respondents suffering from the genetic symptom, Dr. Holick opined Sarah had Ehlers-Danlos Syndrome because she also exhibited these typical characteristics of the Syndrome: blue sclera, joint hypermobility, and

7

doughy-textured skin. Dr. Holick testified a child with Ehlers-Danlos Syndrome can fracture through normal handling and a frank breech birth delivery could exacerbate bone fractures in a child with Ehlers-Danlos Syndrome. This supported testimony and diagnosis is consistent with Dr Barrett's opinion the fractures of both clavicles could be attributed to the breech delivery at Sarah's birth.

Without adjudicating the conflicts in the properly admitted medical evidence and raised between the various physicians' testimonies and opinions and other witnesses, the district court deemed Dr. Holick's admitted expert testimony as "noncredible" and wholly disregarded it, Dr. Adkins', and Dr. Tally's testimonies and opinions. The district court concluded Sarah to be abused and neglected and Joseph neglected on 22 January 2025 and Respondents as responsible. Respondents appeal.

## VII.    Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7B-1001(a)(3) (2025).

## VIII.    Issues

Respondents argue the district court prejudicially erred by concluding Sarah was abused or that Sarah or Joseph were neglected.

## IX.    Standard of Review

"The standard for appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings of fact support its conclusions of law." *In re D.R.B.*, 182 N.C. App. 733, 735, 643

S.E.2d 77, 79 (2007). "The burden in such proceedings shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence." N.C. Gen. Stat. 7B-1109(f) (2025). "The State then has the burden, at the adjudicatory state, to prove neglect and dependency by clear and convincing evidence." *In re Evans*, 81 N.C. App. 449, 452, 344 S.E.2d 325, 327 (1986) (citation omitted).

In reviewing an adjudication order, this Court must determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000) (citations and internal quotation marks omitted).

The "clear and convincing" burden of proof and standard of review "is greater than the preponderance of the evidence standard required in most civil cases." *In re Smith*, 146 N.C. App. 302, 304, 552 S.E.2d 184, 186 (2001) (citation and quotation marks omitted). Petitioners meeting the clear and convincing evidence burden of proof must tender and admit competent evidence beyond a preponderance, of evidence, more likely than not, and "shall be proved" by "evidence which should fully convince." *Id.* (citation and quotation marks omitted). *See* N.C. Gen. Stat. § 7B-805 (2023); *In re J.N.*, 381 N.C. 131, 136, 871 S.E.2d 495, 599 (2022). "The clear and convincing standard requires evidence that "'should fully convince.'" *Scarborough v. Dillard's, Inc.,* 363 N.C. 715, 721, 693 S.E.2d 640, 643 (2009) (citation omitted). *In re*

*Will of McCauley*, 356 N.C. 91, 101, 565 S.E.2d 88, 95 (2002) (quoting *Williams v. Blue Ridge Bldg. & Loan Ass'n*, 207 N.C. 362, 363-64, 177 S.E. 176, 177 (1934). This burden is more exacting than the "preponderance of the evidence" standard generally applied in civil cases, but less than the "beyond a reasonable doubt" standard applied in criminal matters. *Williams v. Blue Ridge Bldg. & Loan Ass'n*, 207 N.C. 362, 363-64, 177 S.E. 176, 177 (1934).

We "review the evidence in order to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984) (citation omitted). The Court reviews the trial court's conclusions of law *de novo. See In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019).

## X. Abuse Adjudication of Sarah

An "[a]bused" juvenile is one "whose parent, guardian, or caretaker" either "[i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means." N.C. Gen. Stat. § 7B-101(1)(a) (2025). The statutes are mandatory on the State and,"[t]he allegations in a petition alleging that a juvenile is abused, neglected, or dependent *shall be proved* [by the petitioner] by clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2025) (emphasis supplied).

Respondent Parents are presumed to be fit, to act consistently with their parental rights, and to act in the best interests of their children. *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 69 L. Ed. 1070, 1078 (1925) ("The child is not the mere

10

creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558 (1972) (Court affirmed the fundamental rights of parents "in the companionship, care, custody, and management" of their children.); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 32 L. Ed. 2d 15, 35 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Washington v. Glucksberg,* 521 U.S. 702, 720, 138 L. Ed. 2d 772, 787 (1997) (that the Constitution, and specifically the Due Process Clause of the Fourteenth Amendment, protects the fundamental right of parents to direct the care, upbringing, and education of their children.); *Troxel v. Granville*, 530 U.S. 57, 68-69, 147 L. Ed. 2d 49, 58 (2000) (Court again unequivocally affirmed the fundamental right of parents to direct the care, custody, and control of their children.).

### A. Challenged Findings of Fact

Multiple precedents have long held:

> In a nonjury trial, it is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony. If different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected. Where there is directly conflicting evidence on key evidence, it is especially crucial that the trial court make its own determination as to what pertinent facts are actually established by the evidence, rather than merely reciting what the evidence may tend to show.

*In re Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365-66 (citations omitted). Respondent-Mother and Respondent-Father independently argue several of the district court's findings and conclusions of "serious physical injury by other than accidental means" are not supported "by clear and convincing evidence," or its conclusions are not by supported findings of fact. N.C. Gen. Stat. §§ 7B-805; 101(1)(a)(2025). I address each argument in turn.

### 1. Finding of Fact 19

Respondent-Mother and Respondent-Father argue the district court's Finding of Fact 19 was unsupported. Finding of Fact 19 provides:

> 19. [Sarah] is not capable of generating the force to create the injuries, breaks or fractures she sustained on or before October 31, 2023. [Sarah] was in the exclusive care of the mother, father, and/or maternal grandmother when she sustained the injuries, breaks or fractures.

While the first sentence is a truism and undisputed for any six-week-old child, the second sentence is unsupported. While district court heard testimony Sarah was in exclusive "custody" of Respondents, it is undisputed many other individuals came into possession of and were in contact with Sarah during and immediately after her long and difficult delivery and birth. and who provided her "care" in the absence of Respondents' physical presence.

No competent evidence tends to show either Respondent, or the Maternal grandmother, had exhibited any prior behaviors, taken any actions. or lack thereof, nor did anything inconsistent with their parental rights or fitness to inflict or allow

harm to Sarah. All evidence tends to show Respondents are fit and caring parents of both their children, who sought competent and professional medical care for their newborn child on multiple occasions. Respondents cannot be presumed to be guilty of parental misconduct nor be compelled to admit to child abuse as a condition to preserving their parental rights to their children.

Finding of Fact 25 found Sarah "was in the sole care and control of her parents in October 2023 per the testimony of the mother." This finding does not account for, reconcile, or adjudicate undisputed evidence of the twelve or more voluntarily-attended medical appointments for Sarah by Respondents in the six weeks since her birth, including the, taking her to the Atrium Health-Cabarrus County Hospital, her exposure to outsiders, and including the providers and staff at Levine Children's Hospital, or by her treating pediatrician, her diagnosed medical condition, or by an admitted testimony of multiple expert medical providers. Respondents followed every recommendation and willingly and immediately took her to each provider, including Levine Children's Hospital. *Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365-66.

### 2. *Finding of Fact 20*

Respondent-Mother and Respondent-Father argue the district court's Finding of Fact 20 was unsupported. Finding of Fact 20 provides:

> 20. As a result of mother's, father's and or maternal grandmother's failure to provide proper care and supervision, [Sarah] was injured. [Sarah] suffered many unexplained injuries, breaks and fractures including but not limited to eye hemorrhage; bruising to the infant's eye;

13

as well as 14 to 15 fractures with many being acute.

The first sentence presupposes the second "unexplained injuries" which were "explained" as a potentially diagnosed genetic medical condition by board certified endocrinologists at Boston University School of Medicine and Duke University Medical Center. This competent and admitted evidence offers a medical explanation for the injuries, which is also supported by Sarah's treating pediatrician, Dr. Wendy Talley, M.D.

Dr. Talley is Sarah's treating and a practicing pediatrician located in Cornelius, NC, and she has over 33 years of experience in this medical field. She graduated from Brody School of Medicine, East Carolina University in 1993. She is affiliated with Novant Health Huntersville Medical Center.

The district court heard testimony from Dr. Barrett, who could not rule out Sarah suffered from Ehlers-Danlos Syndrome, but she only opined it could not be diagnosed in children under five years old, and she simply disagreed with Dr. Holick's and Dr. Adkins admitted expert testimony and diagnosis. This dispute in the competent admitted evidence must be adjudicated and reconciled with supported finding of facts to support lawful conclusions. *Id.*

Finding of Fact 25 finds Sarah had several unexplained injuries "in different stages of healing." The unadjudicated and contradicted testimony of Dr. Barrett could support the finding "her injuries being highly suspicious for non-accidental trauma[.]" Even if true, this finding does not *ipso facto* clearly and convincingly show

14

Respondents or the Maternal grandmother allowed or were the source or cause of the injuries. That statutory burden of proof remains on Petitioner, CCDHS. *Id.*; N.C. Gen. Stat. §§ 7B-805; 101(1)(a) (2025).

### 3. *Finding of Fact 21*

Respondent-Mother and Respondent-Father argue the district court's Finding of Fact 21 was unsupported. Finding of Fact 21 provides:

> 21. Upon information and belief mother, father and maternal grandmother inflicted the injuries or allowed them to be inflicted on [Sarah] by unexplained non-accidental trauma.

Respondent-Father and Respondent-Mother argue the district court's statement "upon information and belief" is not a finding and such assertion is not supported by clear and convincing evidence. Respondent-Mother cites *In re N.X.A.*, 254 N.C. App. 670, 673-74, 803 S.E.2d 244, 247 (2017), wherein this Court examined the requirement of an affidavit to establish jurisdiction in a juvenile proceeding. Contrary to the respondent's argument in *In re N.X.A.*, where the Court noted were not subject to personal knowledge, the petitioner "was not subject to Rule 11(b), governing verification of pleadings by a party, or Rule 11(c), governing verification by agent or attorney, but rather was subject to Rule 11(d), governing verification by the State." *Id.*

"Upon information and belief" is not a clear and convincing ultimate finding ro support a conclusion Respondents or the Maternal grandmother were the source or

cause of the injuries. The statute mandates the burden of proof remains on Petitioner, CCDHS to the mandated standard. N.C. Gen. Stat. § 7B-805 (2025). Contrary to Respondents' assertions, the trial court in *In re E.N.S.* found the findings of fact "by clear and convincing evidence," this Court held the district court's order satisfied N.C. Gen. Stat. § 7B-807(a) by finding and stating in the order "by clear and convincing evidence." *In re E.N.S.*, 164 N.C. App. 146, 152, 595 S.E.2d 167, 171 (2004). The challenged "upon information and belief" finding is unsupported and is inconsistent with the mandates of the statute. *Id.*

### 4. *Finding of Fact 22*

Respondent-Mother and Respondent-Father argue the district court's Finding of Fact 22 was unsupported. Finding of Fact 22 provides:

> Mother, father and maternal grandmother did not provide proper care or supervision of [Sarah]; failed to provide [Sarah] the necessary medical care for the unexplained non-accidental injuries she sustained and that mother, father and maternal grandmother created an environment injurious to the (sic) [Sarah]'s health, welfare, safety and well-being.

This "finding" is unsupported and farcical. Undisputed evidence shows Respondents took Sarah to her pediatrician three times in six weeks, to the two midwives twice, the doula once, to a lactation consultant twice, in the six weeks since her birth.

Respondent-Mother also took Sarah to a chiropractor on 30 October 2023. The following day on 31 October 2023, Respondents voluntarily took and presented Sarah

16

to the Emergency Department at Atrium Health-Cabarrus County around 12:30 p.m. to "double check" her swollen leg and due to the child being "fussy." This undisputed and unrefuted evidence directly contradicts the trial court's "finding" Respondents had "failed to provide [Sarah] the necessary medical care for the unexplained non-accidental injuries she sustained" and is properly disregarded and stricken.

Dr. Barrett testified, and the district court in Finding of Fact 25 found Sarah had "numerous fractures in different stages of healing"; which were "highly suspicious for non-accidental trauma[.]" The district court also found in Finding of Fact 29, since Sarah had been placed with a relative temporary safety provider *i.e.,* her paternal grandparents with Respondents present, Sarah had not suffered additional injuries and was growing well. These findings have no bearing on how, when, and who, if anyone, caused these injuries or if some or all were the result of Sarah's prolonged delivery and rotations, as Dr. Barrett also agreed and testified, and her diagnosed medical condition by two board certified endocrinologists and her treating pedestrian.

### 5. *Finding of Fact 26*

Respondent-Mother and Respondent-Father argue the district court's Finding of Fact 26 was unsupported. Finding of Fact 26 provides:

> 26. [Sarah] was examined by Dr. Nicole Barrett, who specializes in non-accidental trauma with Levine's (sic) Children's Hospital. After hearing Dr. Barrett's testimony, the Court finds that Dr. Barrett is an expert in non-accidental trauma. The fractures that [Sarah] sustained

17

were found to be from twisting and pulling of the extremities or shaking the extremities per Dr. Barrett's report and examination. [Sarah] was 6 weeks old at the time and a 6-week-old infant could not cause these injuries and that these injuries were not sustained at birth but have happened over a period of time as demonstrated by [Sarah]'s fractured bones being in varying stages of healing on or about October 21, 2023 and November 1, 2023.

As noted earlier, the repetitive assertion "[Sarah] was 6 weeks old at the time and a 6-week-old infant could not cause these injuries" is a truism and undisputed. Dr. Barrett testified:

CMLs [Classic Metaphyseal Lesion or corner fracture], in general, have a high specificity for abuse or inflicted injury because of the mechanism that I described. They are not commonly seen in accidental or iatragenic mechanisms. SO iatrogenic would mean, like, we did something to a child, and – and by that, specifically I'm talking about birth-related fractures in an infant. There are CMLs that can be caused by birth; however, typically, that is with a difficult extraction where an extremity is, again, pulled and twisted in order to get the baby out.

And so the literature supports a high specificity for inflicted injury for those reasons.

This finding of fact is supported by competent evidence, but does to implicate any conduct, actions, fault, or complicity by Respondent of unfitness or conduct inconsistent with their parental rights or any improper action by the material grandmother. Taken as true, the source or who or what caused these injuries remains in conflict and cannot support a conclusion Respondents or her material grandmother abused or neglected Sarah or they had neglected Joseph.

### *6. Finding of Fact 34*

Respondent-Father argues the district court's Finding of Fact 34 was unsupported. Finding of Fact 34 provides:

> 34. The allegations contained in the petition support a finding that [Sarah] is abused and neglected. The status of the juvenile has been determined to be abused and neglected in that the juvenile's parent, guardian custodian or caretaker has inflicted or allowed to be inflicted on the juvenile a serious physical injury by other than accidental means, the juvenile's parent, guardian, custodian, or caretaker has created or allowed to be created a substantial risk of serious physical injury to the juvenile by other than accidental means, the juvenile's parent, guardian, custodian, or caretaker does not provide proper care, supervision or discipline, the juvenile's parent, guardian, or caretaker has not provided or arranged for the provision of necessary medical care, and the juvenile's parent, guardian, custodian or caretaker creates or allowed to be created a living environment that is injurious to the juvenile's welfare.

This "Finding" is properly classified as a conclusion of law and is reviewed *de novo*. See *In re C.B.C.*, 373 N.C. at 19, 832 S.E.2d at 695.

### B. Analysis

Respondents argue the evidence and findings do not support the district court's inference they were responsible for her injuries. Respondents cite *In re K.L.*, 272 N.C. App. 30, 845 S.E.2d 182 (2020), wherein this Court reversed an adjudication of abuse and neglect of a three-month old where:

> The trial court was rightly concerned that [the respondents] were unable to explain [the juvenile]'s fractures. But, that alone, as a matter of law, cannot

19

support the trial court's conclusion that [the respondents] were responsible for [the juvenile]'s injuries. There is nothing to bridge the evidentiary gap between the unexplained injuries here and the conclusion that [the respondents] inflicted them, and, in fact, much of the evidence is in tension with that conclusion

*Id.* at 46-47, 845 S.E.2d at 194-95.

Unlike in *In re K.L.*, Sarah's injuries were in various stages of healing and Sarah did not show any signs of injuries after being placed in a safety placement with her paternal grandparents and Respondents. The trial court made findings about the non-accidental nature of Sarah's injuries, and Respondents and Maternal Grandmother being the parental and family caretakers.

Respondents provided multiple medically-supported explanations of what may have caused or explained Sarah's injuries, the existence of bruising and other signs of injury, and "[t]here is nothing to bridge the evidentiary gap between the unexplained injuries here and the conclusion that [the respondents] inflicted them, and, in fact, much of the evidence is in tension with that conclusion." *Id.*

Like in *In re K.L.*, the evidence does not prove Sarah was in the Respondents' exclusive "care" when the injuries may have occurred. While CCDHS "was not required to rule out every remote possibility; nor was it required to prove abuse beyond a reasonable doubt." *In re L.Z.A.*, 249 N.C. App. 628, 638, 792 S.E.2d 160, 168 (2016). It must meet its statutory mandate to carry its burden of proof to overcome the statutory and constitutional presumptions of fit and proper conduct by

the parents. The order, as drafted does not support a conclusion and adjudication of abuse of Sarah by Respondents or her maternal grandmother. *In re K.L.*, 272 N.C. App. at 46, 845 S.E.2d at 194-95. "There is nothing to bridge the evidentiary gap between the unexplained injuries here and the conclusion" to hold Respondents were responsible. *Id.*

## XI.    Neglect Adjudication of Sarah

A "[n]eglected" juvenile is one "whose parent, guardian, custodian, or caretaker" engages in certain statutorily-defined criteria, including failing to "provide proper care, supervision, or discipline" or "[c]reat[ing] or allow[ing] to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15)(a), (e) (2025).

Respondents argue competent evidence in the record is insufficient for CCDHS to carry its burden to clearly and convincedly show the home environment or purported supervision deficits to support an independent basis upon which neglect can be found. This Court examined this issue in *In re L.Z.A.*:

> Here, the evidence supporting the abuse adjudication also supports the neglect adjudication. [The juvenile]'s unexplained, non-accidental injuries while in Parents' custody establish that: (1) she either failed to receive proper care, supervision, or discipline from [the p]arents or lived in an environment injurious to her welfare; and (2) she was physically impaired as a result. We therefore hold that the trial court's neglect adjudication is supported by clear and convincing competent evidence.

*In re L.Z.A.*, 249 N.C. App. at 638, 792 S.E.2d at 169 (internal citation omitted).

21

Here, Respondents presented multiple supported medical explanations to show accidental injuries before and during the birth or congenital issues with undisputed follow-up care where no further injuries were noted by the treating medical providers. *Id.* While the trial court determines the weight and credibility of the admitted competent evidence, unlike in *In re L.Z.A.*, Respondents offered multiple explanations for Sarah's injuries and medical condition, to which CCDHS' medical witness partially agreed and did not refute, and Respondents promptly and voluntarily sought repeated treatments and care for her. *Id.* Upon *de novo* review, the trial court's conclusion of neglect of Sarah is unsupported.

## XII.    Neglect Adjudication of Joseph

Respondents argue the district court erred by concluding Joseph was a neglected juvenile, based solely upon his newborn sister had partially unexplained fractures.

### A. Challenged Findings of Fact

Respondent-Father challenges three findings of fact related to Joseph's adjudication. Respondent-Father asserts they are not supported by clear and convincing evidence.

### *1. Finding of Fact 23*

Respondent-Father argues the district court's Findings of Fact 23 and 30 was unsupported. Findings of Fact 23 and 30 provide:

> 23. [Joseph] would live in a home where another juvenile

has been abused or neglected.

30. [Joseph] lives in a home where another juvenile has been abused or neglected.

As noted above, whether his sister, Sarah, was lawfully adjudicated as abused and neglected is not fully supported and resolved and these findings concerning Joseph are not supported.

### 2. *Finding of Fact 33*

33. The allegations contained in the petition support a finding that [Joseph] is neglected. The status of the juvenile has been determined to be neglected in that the juvenile's parent, guardian, custodian or caretaker creates or allows to be created a living environment that is injurious to the juvenile's welfare.

This finding of fact is properly classified as a conclusion of law, which is reviewed *de novo*. *See In re C.B.C.*, 373 N.C. at 19, 832 S.E.2d at 695.

### B. Analysis

Respondents argue the findings do not support and the district court erred by concluding Joseph was a neglected juvenile based solely upon Sarah's partially unexplained fractures. Our Supreme Court recently examined the adjudication of a sibling of an infant with unexplained fractures in *In re E.H.*:

In these cases, we reaffirmed longstanding precedent holding that a "court may not adjudicate a juvenile neglected *solely* based upon previous Department of Social Services involvement relating to other children," and that there must be "the presence of other factors to suggest the neglect or abuse will be repeated." *In re J.A.M.*, 372 N.C. at 9-10 (emphasis added). But we also recognized that

23

those "other factors" can be circumstances surrounding the abuse itself that indicate other children in the home could face similar harm. *In re A.J.L.H.*, 384 N.C. at 55.

Thus, when another child in the same home has suffered some abuse or injury, the trial court should assess how and why that harm occurred, whether other children in the home could be subject to that same harm, and whether the parents display a willingness to "remedy the injurious environment" that caused the harm so that it cannot occur again. *Id.* at 56; *In re A.W.*, 377 N.C. at 249. Facts that can demonstrate a parent's unwillingness to remedy the injurious environment include offering an "implausible explanation" for the abuse of another child, "failing to acknowledge" another child's abuse, or "insisting that the parent did nothing wrong when the facts show the parent is responsible for the abuse." *In re A.J.L.H.*, 384 N.C. at 56; *see also In re A.W.*, 377 N.C. at 248-49.

*In re E.H.*, 388 N.C. 100, 105-06, 919 S.E.2d 233, 237 (2025). The Supreme Court

further held:

When a child is severely abused in the parents' care, and the parents cannot provide any plausible explanation for how those injuries occurred or assure social workers that the abuse will not happen again, the trial court properly can find that there is an unacceptable risk of similar abuse to other children in that same home in the future. *In re D.W.P.*, 373 N.C. at 339-40; *In re A.W.*, 377 N.C. at 248-49; *In re A.J.L.H.*, 384 N.C. at 55-56.

*Id.* at 107, 919 S.E.2d at 238.

Sarah's brother, Joseph, was born 20 September 2020. The district court found

Joseph could be subject to the same harm on 22 February 2025. For over five years

no evidence tends to show and CCDHS did not present nor did the district court find

not a scintilla of evidence or facts, which demonstrate Respondents had provided an

24

unsafe home or environment or any unwillingness to remedy any purported injurious environment for him, but is otherwise culpable for neglecting Joseph for offering a purported and partial "implausible explanation" for portions of six weeks of and "*solely*" based upon Sarah's injuries. *Id.* at 107, 919 S.E.2d at 237. *In re E.H.*, 388 N.C. at 105, 919 S.E.2d at 237.

Respondents, like the respondents *In re E.H.*, assert they did not know how or why Sarah's sixteen fractures came about in the six weeks in their non-exclusive "care". Respondents attempted to pinpoint multiple medically-based explanations for Sarah's injuries and offered unimpeached evidence from Sarah's medical providers. Given the more than twelve medical visits in the six weeks after Sarah's birth, as is noted above Finding of Fact 22: is categorically unsupported.

> Mother, father and maternal grandmother did not provide proper care or supervision of [Sarah]; failed to provide [Sarah] the necessary medical care for the unexplained non-accidental injuries she sustained and that mother, father and maternal grandmother created an environment injurious to the (sic) [Sarah]'s health, welfare, safety and well-being.

In light of the undisputed evidence to the contrary, this "finding" is farcical.

## XIII.   Conclusion.

> In a nonjury trial, it is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony. If different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected. *Where there is directly conflicting evidence on key evidence,*

> *it is especially crucial that the trial court make its own determination as to what pertinent facts are actually established by the evidence, rather than merely reciting what the evidence may tend to show.*

*In re Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365-66 (emphasis supplied).

"When a trial court is required to make findings of fact, it must find the facts specially." *In re Harton,* 156 N.C. App. 655, 660, 577 S.E.2d 334, 337 (2003) (internal citations and quotations omitted). "Thus, the trial court must, through 'processes of logical reasoning,' based on the evidentiary facts before it, 'find the ultimate facts essential to support the conclusions of law.'" *In re O.W.,* 164 N.C. App. 699, 702, 596 S.E.2d 851, 853 (2004) (quoting *Harton,* 156 N.C. App. at 660, 577 S.E.2d at 337). The findings "must be the 'specific ultimate facts . . . sufficient for the appellate court to determine that the judgment is adequately supported by competent evidence.'" *In re Anderson,* 151 N.C. App. 91, 97, 564 S.E.2d 599, 602 (2002) (citation omitted).

Remand for reconciliation, adjudication, and supported findings and conclusions on the evidence is not an appellate usurpation of the trial court's role to make credibility determinations of conflicting witnesses, testimony, and evidence., Rather it is a recognition of the duty of the fact finder to adjudicate and reconcile those conflicts with findings, which "must be the 'specific ultimate facts . . . sufficient for the appellate court to determine the judgment is adequately supported by competent evidence, when the conclusions are reviewed *de novo. Id.*

The district court's adjudication order is properly remanded for supported

26

findings, reconciliation of conflicts, and adjudication. Subsequent events and actions and current status of the parties should be received in order for the court to render complete and supported conclusions and judgment to enable appellate review. I respectfully dissent.